GEORGE W. BITTLE, PLAINTIFF IN ERROR, v. THE CAMDEN AND ATLANTIC RAILROAD COMPANY, DEFENDANT IN ERROR.

1. A railroad company is bound to use ordinary care and prudence in giving statutory signals of the approach of its trains toward a station and crossing, and in passing them, or wherever at any given point such signals are allowed or required to be given, and negligence in the exercise of its right and duty in this respect is actionable negligence.
2. The court will take judicial cognizance that the blowing of a whistle is one of the signals used in operating and running a railway train, and that it is authorized and required in approaching stations and crossings, and in passing them, yet if it be done negligently, wantonly or maliciously, such negligence, wantonness or maliciousness is actionable if injury results therefrom.

On error to the Supreme Court.

For the plaintiff in error, *John W. Wescott.*

For the defendant in error, *Samuel H. Grey.*

The opinion of the court was delivered by

LIPPINCOTT, J.　The plaintiff below, who is also the plaintiff in error, sued the Camden and Atlantic Railroad Company to recover damages for personal injuries.

The evidence on the part of the plaintiff shows that the accident out of which the injuries to the plaintiff arose occurred at Berlin, in the county of Camden, on March 23d, 1891, about five o'clock in the afternoon. The plaintiff was, with a horse and wagon, engaged near the station at Berlin in unloading manure from a freight car of the defendants, on a side track, and carting the same to a field not far away. On one of these trips he had loaded the wagon with manure, and had gotten off the car to drive away with his load to the field, when his attention was called to the fact of an approaching train on its way from Philadelphia to Atlantic City. The load on the wagon was nearly a ton

in weight, and his horse was a young and spirited animal, but one which to a considerable extent, by the evidence, had been accustomed to cars, and not ordinarily scared by them. He was with his horse and wagon about seventy-five yards away from the main tracks, near a siding upon which the freight cars holding the manure were standing, which siding ran nearly parallel with the main track on which the passenger train was approaching, and the roadway or other way upon which he was to drive with his load ran about parallel with these tracks and in the same direction in which the train was going. The evidence shows that from this point he could not be seen by the engineer of an approaching train until the train came nearly or about opposite to the point where he was engaged. When the plaintiff's attention was called to the approaching train, he took hold of the head of his horse and was in the act of leading him along this roadway in which he was to go on his way to the field, and whilst doing this the train, which was somewhat behind time, came along and passed the station at a high rate of speed. The evidence on the part of the plaintiff does not show that the whistle blew or the bell rang before this point was reached. The evidence on the part of plaintiff, in substance, shows that, as the train came to this point, the engineer leaned out of the cab window, looked at the plaintiff holding his horse by the head, and then suddenly reached up and opened the valve and blew a loud, shrill whistle, which so frightened the horse that it became entirely unmanageable, and the plaintiff, in his efforts to control it and prevent it from running away, was very seriously injured.

The situation, by the evidence, appeared to be that there is an eastbound and a westbound main track passing this station; the station faces the north, and the main tracks are in front of the station. Some short distance west of the station Taunton avenue, a public highway, crosses the tracks at right angles; immediately at the station Jackson street, a public highway, crosses the tracks at right angles. About one hundred yards east of the station there is also another crossing, called Bishop's crossing, also a highway, and still further east, nearly a half

mile away, there is another crossing, called Bishop's road. Back of the station, on the south side, nearly seventy-five yards away, was the side track on which the carload of manure was standing from which the defendant was loading his wagon. The side track was nearly parallel with the main track, deflecting a little to the south.

Upon the manner in which the whistle was blown, the plaintiff testifies that when his wagon was loaded he got off the car on the ground and took the horse by the head, and started out away from the car to go to the field with his load, when his attention was called to the approaching train; that the Jackson street crossing is at the end of the station; this was the point opposite which the plaintiff was holding his horse, and he says: "I didn't think of them blowing the whistle there, because he was just beyond the crossing when he blowed the whistle, and he was looking with his head out of the cab window, and saw me, and he was smiling, and he just reached up and pulled his whistle as I call it 'wide open,' and the instant he done that she jumped." In another place in his evidence he says: "As soon as he saw me he reached right up and pulled the whistle;" and that he "never heard a shriller whistle in his life;" that it was "a great deal louder than the usual whistle, and that it was so blown for two hundred yards;" and he further says, so far as his hearing was concerned, the whistle did not blow until the train was just beyond the crossing at Jackson avenue, opposite the point where the plaintiff was with his horse and wagon, and that the whistle has never since been blown at this point, and that at the time it was blown in this manner there was nothing on the track ahead to provoke such a whistle.

It may be well said that there exists, if this evidence be true, a question whether there was not only negligence but wantonness on the part of the engineer in blowing this whistle as he did.

Mr. Minnard, a witness, who lives opposite and about seventy feet from the station, a little beyond the easterly end, testifies that he was back of his house when he first heard the

locomotive whistle, and that it sounded like a cattle call, and
he supposed it was such, and started around the end of his
house, when his wife met him and told him that a horse was
running away; that there was no way of measuring the sound
of the whistle, but that it was a cattle call—a loud, shrill
whistle; that it was a great many times louder than the ordin-
ary blow on approaching a station, or what they used to blow
on approaching.    He thought somebody was on the track, and
he started, supposing some one was on the track.    The train
was running at such rate of speed that, before he got around
his house, it was a mile and half away.    He then describes
the efforts of the plaintiff to control the horse, and that he
wouldn't have attempted its control for all the horses in the
county.

Harry Beckly, another witness, whose attention was called
to the matter when the horse started, and while he had no oc-
casion before that time to note the particulars, testifies that he
saw a man have his head out of the cab window, and that he
blew the whistle.    He described it as being louder than usual,
but otherwise took no note of it except that the whistle did
not blow till the engine was opposite the house of Mr.
Minnard.

Arthur W. Robinson, a witness, who was unloading a freight
car next to the car from which the plaintiff was unloading,
described the whistle as ": a long, loud blow;" that "it was
an uncommonly loud blow, loud and long," and that he never
heard a train blow in that place before.    This witness states
that he heard no whistle blow upon the approach of this train
towards the station and crossings there.

William Boardly, a witness, described the whistle as a
"real loud blow"—that it was a quick, loud blow—louder
than he had heard before; that when the whistle bursted out,
as he describes it, he looked up and saw a man hold of the
whistle, with his head out of the cab window; that he was
looking toward the plaintiff, and that he looked as if he was
laughing.

Harry Bittle swears that the whistle has not blown at this place since.

. There is much other evidence on the part of the plaintiff as to the situation of the crossings—the number of them and the distance apart, the location of the main tracks and the side track upon which the freight car stood. There is some evidence to show that the engineer, on approaching this station, could not see the plaintiff in the position in which he was with his horse and wagon, but at the point where the witnesses identify this unusual blowing of the whistle there appears to have been no difficulty in this respect; the plaintiff with his horse and wagon was in plain view of the engineer or other person in the cab looking from the cab window.

At the close of the evidence the defendant moved a nonsuit, which was granted on three grounds :

*First.* That the blowing of this whistle at this place where it was blown was not an unlawful act of the defendant in view of statutory authority in this respect, and that the company was authorized to blow the whistle in this place ; and,

*Secondly.* That there was nothing peculiar about the blowing of the whistle which made it unlawful, or constituted the manner of its blowing actionable negligence; that the only question raised upon this point was whether the whistle blown was the one ordinarily to be blown at this crossing or place, or whether it had an audibility which to some witnesses created the idea that there was something on the track ahead of the train, and whether the distinction between those two degrees of whistling constituted actionable negligence.

The trial court held that these were questions of law, and to be determined by the court, and they were determined in favor of the defendant.

Besides these two points, the further finding of the court was that even if the engineer was negligent, still there existed contributory negligence on the part of the defendant; that if there was negligence on the part of the engineer, still that negligence was shared by the plaintiff, in that the engineer saw all that could be seen, and saw nothing more than the plaintiff

knew himself; or, in other words, he saw a man who thought he had his horse under management, leading the horse in a manner which ordinarily does give a man such control. So that if there was a mistake in judgment, if there was negligence in the judgment on the part of the engineer, it was negligence which was fully shared by the plaintiff. If, therefore, there was negligence, the negligence of the engineer and the plaintiff was identical. Both thought, and had a right to think, the same thing, except that the plaintiff knew what he was thinking about, and the engineer could not know what the plaintiff thought, and that it was a case in which, whatever the negligence of the engineer, he borrowed it from the plaintiff, and he was no more nor less negligent than the plaintiff, and their negligence resulted from precisely the same failure to foresee exactly what the horse would do under such blowing as the whistle might give at that place and under the circumstances.

Upon these grounds the trial justice at the Circuit non-suited the plaintiff.

Upon review of this case, the conclusion is that, under the statute authorizing the points and distances at and for which either a whistle shall be blown or a bell rung, the defendant had the right to blow this whistle at this point.

The statutory signal was required here, and by force of the statute, considering the proximity of these crossings to each other, it became the duty of the defendant to ring the bell or blow the whistle, and continue to do so until the engine had crossed the first three streets or highways named, and this duty was performed when either the whistle was so blown or the bell so rung, and such duty, if properly performed, could not be made the source of complaint, whatever might be the results, but to fully comply with such statutory duty, and free itself from fault, the defendant was compelled to commence the blowing of such whistle at the point provided by the statute, and continue it over the space provided.

Now, there is evidence here on the part of the plaintiff, and considerable of it, too, that neither the bell was heard to ring

nor the whistle to blow until the point of accident was reached. If this be true, the defendant did not comply with the statutory requirements as to warning signals in approaching these crossings, and it is difficult to perceive why this element of negligence in this case should not have been submitted to the jury. *Rev., p.* 910, § 6. The plaintiff in this case, under the circumstances in which he was placed, might, perhaps, be well entitled to this warning. *New York, &c., Railroad Co.* v. *Leaman,* 25 *Vroom* 202. Then, again, if no whistle was blown until Jackson avenue crossing was reached, as appears by some of the evidence, and then there was a sudden call, no previous warning being given, the question arises whether also this fact, so far as it affects the plaintiff, should not have been submitted to the jury, upon the inquiry as to the exist-, ence of negligence of the defendant in the performance of its duty to the plaintiff.

But these considerations do not appear to have entered into the holding of the trial justice upon the motion to nonsuit, and are not deemed necessary to be discussed in this review.,

Thus, whilst the legal right to blow the whistle at this point may be conceded, yet it does not, by any means, follow that this right could be exercised in a negligent, heedless or wanton manner by the servants. of the defendant, resulting in an injury to the plaintiff, and this, as the case is presented, appears to be the difficulty. The question here is whether this whistle was so negligently, needlessly or wantonly blown as to have caused this injury to the plaintiff. Abstractly, this question, in any given case where an inference of this character may be reasonably drawn from the evidence, should be committed to the jury for its decision and not assumed by the court.

It is not necessary to repeat the circumstances of the accident. One fact upon the evidence seems to be clear, whether the whistle was blown or not, or continuously or not, before the point of accident was reached, and that is, that the engineer, whilst apparently looking at the plaintiff, who, with his horse and wagon, was in full view, holding his horse or

leading him in the usual manner along the way provided, reached up and gave to his whistle an extra force of sound, shrill and loud, louder and shriller than ever was heard before. It is described as a cattle call by one witness, a call which is usually made when cattle are upon the track, ahead of the train, or a call by reason of some sudden danger. This accident was apparently the result of this manner of sounding this whistle. There is no evidence in the case, at this point, that such a sounding of the whistle was called for by any danger to the train whatever from obstructions ahead of it, on or near the track. The plaintiff, with his horse, was in no situation of danger, and it must be said, with some degree of emphasis, that, upon the evidence as it stood at the close of the plaintiff's case, there was every appearance of negligence and heedlessness, if not wantonness, in the act of blowing this whistle in the manner in which it was blown. It must be that the defendant is bound to use reasonable care and prudence in giving statutory signals of the approach of a train, or its existence, at any given point where such signal may be allowed or required. Negligence in the exercise of a lawful right is actionable if it causes injury. It is no excuse or justification that an act occasioning injury was itself lawful or that it was done in the exercise of a lawful right, if the injury arose from the negligent manner in which it was done. *Pennsylvania Railroad Co.* v. *Barnett*, 59 *Pa. St.* 259. This is quite aside from the question whether blowing at this point could do any good or not. It was their legislative duty to blow the whistle, and it cannot be said that legal injury can arise from the proper performance of this duty, but the pregnant question always is whether, under all the circumstances of the case, reasonable care has been used in the exercise of legislative right and the performance of the legislative duty. A negligent exercise of the right or the negligent performance of the duty can in no event be excused. *Bradley* v. *Boston Railroad Co.*, 2 *Cush.* 539; *Linfield* v. *Old Colony Railroad Co.*, 10 *Id.* 562; *Wakefield* v. *Connecticut and Passumpsic River Railroad Co.*, 37 *Vt.* 330.

In *Philadelphia, Wilmington and Baltimore Railroad Co.* v. *Stinger*, 78 *Pa. St.* 219, the case was that the plaintiff was driving his horse parallel with defendant's tracks and the horse was frightened by the whistle ; the court reversing said : " If the court below had left it to the jury to find negligence from the use of the whistle the second time, if they believed it to be so used, provided the engineer saw, or with proper care might have seen, the plaintiff's wagon, and that his horse was becoming unmanageable, there would have been no error." There were two blasts of the whistle in this case cited, and the court allowed the jury to say whether the first blast was negligent. In this case there was no question of the right to use the whistle at the point at which it was used. The question was whether it was used in a negligent manner.

*Hill* v. *Portland and Rochester Railroad Co.*, 55 *Me.* 438, is a case nearly in point with the case in hand. There a horse was standing at the depot, the train started and the engine driver blew a sharp, loud blast, which frightened the horse. The defendant had legislative authority to blow the whistle there, but the question of whether there was negligence in the manner of blowing the whistle was left to the jury.

In *Culp* v. *Atchison and Nebraska Railroad Co.*, 17 *Kans.* 475, the declaration charged a negligent blowing of the whistle was the cause of the injury. On demurrer it was held actionable. To the same effect may be cited the case of *Chicago, Burlington and Quincy Railroad Co.* v. *Dunn*, 52 *Ill.* 451.

While a railway company is entitled by law to run its train along a street, it is not liable for damages caused by the horses of a traveler taking fright at the necessary blowing off of steam from one of its locomotives ; but if the steam was blown off negligently it would be liable. *Hahn* v. *Southern Pacific Railway Co.*, 51 *Cal.* 605.

Under our statute, in this state, the court will judicially know that the blowing of a whistle is one of the signals used in running a railway train, and that it is authorized and required, yet if it be done negligently or wantonly, such

negligence or wantonness is actionable. 1 *Thomp. Negl.* 351 and cases cited; *Toledo, &c., Railroad Co.* v. *Harmon*, 47 *Ill.* 298; *Nashville, &c., Railroad Co.* v. *Starnes*, 9 *Heisk.* 52. So in case of the sounding a steam whistle with a loud noise when it was unnecessary. *Ib.* And where it was a negligent act. *Chicago, &c., Railroad Co.* v. *Dunn*, 52 *Ill.* 451. Where it was done in a spirit of wanton playfulness. *Nashville, &c., Railroad Co.* v. *Starnes*, 9 *Heisk.* 52.

And, so far as the adjudicated cases go, the question whether the act was one of negligence or of wantonness or malice is of little import, save as to the measure of damages.

Reference has been made to these few cases on the subject of the care to be exercised in giving even the statutory signals, to show that this specific character of negligence has been the subject of adjudications. It, of course, cannot be at all denied that there may be such negligence, heedlessness or wantonness in the sounding of railway whistles, even at the places where it is authorized and required to sound them, as to be entirely actionable.

Whilst no liability attaches for damages for these acts so long as they are exercised in accordance with the statutory authority with ordinary care, yet liability ensues when they are done negligently or wantonly. The rule obtains, generally, that a master is not answerable in damages for the wanton and malicious acts of his servant, yet this immunity is not generally extended to railroad corporations, whose servants are entrusted with such extensive means of doing mischief. Accordingly, it has been established that if such servants, while in charge of the company's engines and machinery and engaged about its business, negligently, wantonly or willfully pervert such agencies, the company must respond in damages, and this is the principle deducible from the authorities upon this subject.

Applying these principles to the facts and circumstances of this case, it leads to the conclusion that the jury should have been permitted to pass judgment upon the question whether

this whistle was blown in such a negligent, willful or wanton manner as to be actionable.

Turning to the question of whether the plaintiff was guilty of contributory negligence in this case, it seems very difficult to determine upon what ground such contributory negligence can be imputed to him. Neither by his own act nor any act of his, uniting with the act of the engineer in blowing this whistle, can want of care be attributable to him. It would appear that he was then, so far as his own case goes, exercising every care which a prudent man could exercise. He was in a place and on a way where he had the legal right to be—in fact, at a place provided by the defendant for him to be—in the business of unloading freight from its own cars, and he was on the very grounds prepared by the company for this use, and engaged in an occupation perfectly legal and proper, and one which was of advantage to the defendant. On learning of the approach of the train, although without hearing any statutory signal, he exercised care in placing himself in a position in which he would be most conveniently able to control his horse in case the exercise of such control was needed, and he used every endeavor possible to so control it and avoid injury.

And in the discussion of this question, it is assumed that he was guilty of no act of negligence in endeavoring to control and save from injury the horse which he had in charge, and whilst no opinion can perhaps be passed here as to the conclusion or inference to be drawn from these facts, yet, for the purposes of this case, it would appear as if the inference of ordinary care and caution to avoid injury is the most reasonable one, and, at all events, not so clearly otherwise as to deprive the jury of the right to pass on it.

Upon this question of whether a nonsuit upon either of these grounds here discussed should have been granted, the rule of law to apply has often been enunciated in this court, and there is but little need of referring to more than one or two cases. It is by applying these general rules to each particular case that a safe conclusion can be reached.

The Chief Justice, in *Pennsylvania Railroad Co.* v. *Matthews*, 7 *Vroom* 531, in this court, speaking to the question whether the plaintiff, by his want of ordinary caution, produced the damage, says : " It is sufficient, for all useful purposes, to say that the evidence on this subject is open to fair debate, and leaves the mind in a state of some doubt on this question whether the driver of the horses which were destroyed exercised or not that degree of care which his legal duty exacted. This being the case, the judge would not have been justified in taking this question from the jury. Such a course is proper only when the absence of caution is apparent and is, in reason, indisputable."

This general doctrine has been universally adopted, and in *Bahr* v. *Lombard, Ayres & Co.*, 24 *Vroom* 233, Mr. Justice Garrison, in this court, as alike applicable to the defendant upon alleged proof of negligence, and to the plaintiff upon alleged proof of contributory negligence, declares that : " When, in an action for negligence, the standard of duty can be predicated as matter of law, the only question for the jury is whether the conduct of the defendant fell short of that standard. If, from the facts in evidence, two inferences as to the defendant's conduct may legitimately be drawn, one favorable and the other unfavorable to its negligence, a question is presented which calls for opinion of the jury."

Passing over the many decided cases adhering to this doctrine, the latest expression on this subject is by Mr. Justice Magie, in this court, in *Newark Passenger Railway Co.* v. *Block, ante p.* 605, where, in speaking of the power to direct a nonsuit or verdict, he says : " The power to direct a verdict is identical with and rests upon the same foundation as the power to nonsuit." When, in such cases, the trial judge is requested to nonsuit or direct a verdict, his duty is well expressed by Lord Chancellor Cairns, in *Metropolitan Railway Co.* v. *Jackson*, 3 *App. Cas.* 193, to say whether any facts have been established by evidence from which negligence may be reasonably inferred. If none, there is no case to go to the jury, but if, from facts established, negligence may

reasonably and legitimately be inferred, it is for the jury to find whether, from those facts, negligence ought to be inferred. In performing this function, the trial judge must take care not to trench on the peculiar province of the jury to determine questions of fact, and must bear in mind that the question is not whether he would infer negligence from the established facts, but whether negligence can be reasonably and legitimately inferred by the jury. It follows that if the real facts have not been established by the evidence, but remain in substantial dispute, the trial judge must submit them, and the inferences to be drawn from those which the jury find established, to the determination of the jury. *Moebus* v. *Becker*, 17 *Vroom* 41 ; *Railroad Co.* v. *Shelton, ante p.* 342 ; *Crue* v. *Caldwell*, 23 *Vroom* 215.

Applying these principles to the case here upon review, the trial judge should have submitted the question of the defendant's negligence and the question of the plaintiff's contributory negligence, if it was alleged that any existed, to the jury.

I shall therefore vote for a reversal of the judgment of nonsuit and for a *venire de novo.*

*For affirmance*—MAGIE, VAN SYCKEL. 2.

*For reversal* — THE CHANCELLOR, CHIEF JUSTICE, ABBETT, DEPUE, DIXON, LIPPINCOTT, REED, BOGERT, BROWN, CLEMENT, KRUEGER, SMITH. 12.