SOUTHERN COTTON OIL COMPANY, *Plaintiff in Error*, v. L. J. ANDERSON, *Defendant in Error*.

Opinion Filed June 30, 1920.

Petition for Rehearing Denied December 16, 1920.

1. A motor vehicle operated on the public highways is a dangerous instrumentality, and the owner who entrusts it to another to operate is liable for injury caused to others by the negligence of the person to whom it is entrusted.

2. "The servant is empowered by the master to discharge certain duties, and it is incumbent upon him to exercise the same care and attention which the law requires of the master; and if that care and attention be about the management and custody of dangerous appliances, the master cannot shift the responsibility connected with the custody of such instruments to the servant to whom they have been intrusted, and escape liability therefor. This rule arises from the absolute duty which is owing to the public by those who employ in their business dangerous agencies or appliances, engines, or instruments—liable, if negligently managed, to result in great damage to others."

3. An automobile operated upon the public highways being a dangerous machine, its owner is responsible for the manner in which it is used and his liability extends to its use by any one with his knowledge or consent.

4. The Legislature under its police power to protect the public from dangerous instrumentalities using the highways has imposed rigid restraints, regulations and restrictions upon the use of motor vehicles, thus recognizing the danger from their operation, which makes owners liable in damages under the doctrine of *respondeat superior* as applied to dangerous agencies..

5. Chapter 7275, Acts of 1917, treats the automobile when oper-
ated on the public highways as a dangerous instrumentality
so as to require special regulation and control under the po-
lice power, and it is not divested of its dangerous character
in an action for damages caused by the negligence of the
operator who is using the car with the owner's knowledge or
consent.

6. In entrusting a servant with a highly dangerous agency the
master puts it in his servant's power to mismanage it, and
as long as it is in his custody or control under such author-
ity the master is liable for any injury committed through
the servant's negligence.

A writ of error to the Court of Record for Escambia
County; E. C. Love, Judge.

Judgment affirmed.

*Watson & Pasco* and *Blount & Blount & Carter,* for
Plaintiff in Error;

*F. W. March* and *Scott M. Lofton,* for Defendant in
Error.

BROWNE, C. J.—This is an action by Louis J. Anderson
against the Southern Cotton Oil Company for personal
injuries caused by the negligent operation of an automo-
bile belonging to the Southern Cotton Oil Company.

The case is before the court for the second time.

On the first hearing Anderson, the plaintiff below,
brought writ of error to test the ruling of the trial judge
in directing a verdict for the defendant. This we held
was error, and the judgment was reversed on that ground.
Anderson v. Southern Cotton Oil Co., 73 Fla. 432, 74
South. Rep. 975.

On a retrial of the cause the plaintiff obtained a verdict and judgment for $7,500.00 with interest, and the defendant is here on writ of error complaining that the evidence was insufficient to sustain the verdict, and of rulings of the court on the evidence and of certain instructions given on request of the defendant.

The defendant in error contends that as this court reversed the former judgment on the ground that there was substantial evidence tending to prove the issue, we are bound by that as the law of the case, and should not disturb the ruling of the trial judge on the sufficiency of the evidence to support the verdict rendered on the second trial where the testimony is substantially the same as on the first.

The rule contended for in that proposition is supported by strong authority. In Pleasants v. Fant, 22 Wall. (U. S.) 116, it is thus stated:

"In the discharge of this duty it is the province of the court, either before or after the verdict, to decide whether the plaintiff has given evidence *sufficient* to support or justify a verdict in his favor. Not whether on all the evidence the preponderating weight is in his favor, that is the business of the jury, but conceding to all the evidence offered the greatest probative force which according to the law of evidence it is fairly entitled to, it is *sufficient* to justify a verdict? If it does not, then it is the duty of the court after a verdict to set it aside and grant a new trial. Must the Court go through the idle ceremony in such a case of submitting to the jury the testimony on which plaintiff relies, when it is clear to the judicial mind that if the jury should find a verdict in favor of plaintiff that verdict would be set aside and a new trial had?

Such a proposition is absurd, and accordingly we hold the true principle to be, that if the court is satisfied that, conceding all the inferences which the jury could justifiably draw from the testimony, the evidence is insufficient to warrant a verdict for the plaintiff, the court should say so to the jury."

In Wilson v. Jernigan, 57 Fla. 277, 49 South. Rep. 44, the distinction is drawn between the duty of the court on a motion to direct a verdict, where there is evidence tending to prove the issue, and the denial of a motion to set aside the verdict on the ground of the insufficiency of the testimony to support it. The court said: "The first assignment is based upon the overruling of the motion for a new trial, while the seventh is based upon the refusal of the trial court to instruct or direct the jury to return a verdict in favor of the plaintiffs," and held that the request for a directed verdict in favor of the plaintiff "was properly refused," citing German-American Lumber Co. v. Brock, 55 Fla. 577, 46 South. Rep. 740; Starks v. Sawyer, 55 Fla. 596, 47 South. Rep. 513; McKinnon v. Johnson, 57 Fla. 120, 48 South. Rep. 910.

The case being submitted to the jury a verdict was rendered for defendant, and this court reversed the judgment because the trial judge refused to set it aside on the grounds that the evidence was insufficient to warrant the jury in finding a verdict for the defendant.

Thus the court approved the ruling of the trial court refusing to direct a verdict for the defendant, and reversed the judgment because he denied the motion to set aside the verdict on the ground that "the evidence adduced was not sufficint to warrant the jury in returning a verdict for the defendant."

This court has endeavored in several cases to point out the distinction between what is essential on motion to direct a verdict, and on motion to set aside a verdict because the evidence is insufficient to support it. The distinction is probably as clear as language is capable of showing so shadowy a difference, but it is the frequent cause of contention before this court, and the trial judges are often lost in its mazes.

What this court has said on this subject can be found in Carney v. Stringfellow, 73 Fla. 700, 74 South. Rep. 866; Gravette v. Turner, 77 Fla. 311, 81 South. Rep. 476.

It is not necessary to consider the assignments of error separately, as this case must be decided on a doctrine that disposes of all of them adversely to the plaintiff in error.

It is conceded by the plaintiff in error that the negligence of the driver of the automobile that caused the injury to the defendant is established, and the only issue is the responsibility of the Southern Cotton Oil Company for this negligence. This responsibility must be measured by the obligation resting on the master or owner of an instrumentality that is peculiarly dangerous in its operation when he entrusts it to another to operate on the public highways.

The rule is not a new one, and far from being the enunciation of "a judicial statute" as intimated by counsel for plaintiff in error, it is but the application of an old and well settled principle, to new conditions. The rule is thus stated in Pollock on Torts, 506; "The law takes notice that certain things are a source of extraordinary risk, and a man who exposes his neighbor to such a risk is held, although his act is not of itself wrongful, to in-

sure his neighbor against any consequent harm not due to some .cause beyond human foresight." * * * "Some times the term 'consummate care' is used to describe the amount of caution required; but it is doubtful whether even this be strong enough. At least, we do not know of any English case of this kind (not falling under some recognized head of exception) where unsuccessful diligence on the defendant's part was held to exonorate him." * * * "This amounts to saying that in dealing with a dangerous instrument of this kind the only caution that will be held adequate in point of law is to abolish its dangerous character altogether."

It is true that in the early development of this very salutary doctrine, the dangerous agencies consisted largely of fire, flood-water and poisons. In Dixon v. Bell, 5 Maule & S. 198, Lord Ellenborough extended the doctrine to include loaded fire-arms. With the discovery of high explosives they were put in the same class. As conditions changed it was extended to include other objects that common knowledge and common experience proved to be as potent sources of danger as those embraced in the earlier classifications. The underlying principle was not changed, but other agencies were included in the classification.. Among them are locomotives, push-cars, street cars, etc., and it is now well settled that these come within the class of dangerous agencies, and the liability of the master is determined by the rule applicable to them. The reasons for putting these agencies in the class of dangerous instrumentalities, apply with equal if not greater force to automobiles.

This is recognized in the case of Weil v. Kreutzer, 134 Ky. 563, text 567, 121 S. W. Rep. 471:

"An automobile is nearly as deadly as, and much more

dangerous than, a street car or even a railroad car. These are propelled along fixed rails, and all that the traveling public has to do to be safe is to keep off the tracks; but the automobile, with nearly as great weight and more rapidity, can be turned as easily as can an individual, and for this reason is far more dangerous to the traveling public than either the street car or the railway train."

The discussion of this question in Nashville & Chattanooga R. Co. v. Starnes, 9 Heisk. (Tenn.) 52, 24 Am. Rep. 296, is enlightening in this connection. The court said: "It was the established doctrine of the common law that the master is not liable for the torts of the servants not committed in the line of the master's service, or with his assent or ratification. This doctrine has been greatly modified as applied to railroad companies, on account of the absolute necessity for more stringent rules for the protection of life and property, against the perils of the steam engine and its capacity for mischief."

In Black v. Rock Island A & L. R. Co. 125 La. 101, 51 South. Rep. 82, 26 L. R. A. (N. S.) 166, the court said:

"The right to operate a steam locomotive on or across a street in a town involves the use of an agency highly dangerous to life, limb and property, and the responsibility for the exercise of such right cannot be shifted by the corporation in which it is vested to the person who, by its authority, actually exercises it."

Says the Supreme Court of the United States: "The intrusting such a powerful and dangerous engine as a locomotive to one who will not submit to control, and render implicit obedience to orders, is itself an act of negligence, the *causa causans* of the mischief, while the proximate cause, or the *ipsa negligentia* which produces

it, may truly be said, in most cases, to be the disobedience of orders by the servant so intrusted. If such disobedience could be set up by a railroad company as a defense, when charged with negligence, the remedy of the injured party would in most cases be illusive, discipline would be relaxed, and the danger to the life and limb of the traveller greatly enhanced. Any relaxation of the stringent policy and principles of the law affecting such cases would be highly detrimental to the public safety." Philadelphia & Reading R. Co. v. Derby, 14 How. (U. S.) 468. On the subject of a locomotive being a dangerous agency, see also Duggins v. Watson, 15 Ark. 118, 60 Am. Dec. 560; Nashville & Chattanooga R. Co. v. Starnes, *supra;* Bittle v. Camden & A. R. Co., 55 N. J. L. 615, 28 Atl. Rep. 305, 23 L. R. A. 283; Kerwhacker v. Cleveland, C. & C. R. Co., 3 Ohio St. 172, 62 Am. Dec. 246; Texas & P. R. Co. v. Scoville, 62 Fed. 730, 10 C. C. A. 479, 23 U. S. App. 506, 27 L. R. A. 179; Barmore v. Vicksburg, S. & P. R. Co., 85 Miss. 426, 38 South. Rep. 210, 70 L. R. A. 627.

A push car operated on a railroad track has been held to be a dangerous agency. Salisbury v. Erie R. Co., 66 N. J. L. 233, 50 Atl. Rep. 117, 55 L. R. A. 578; and in Danbeck v. New Jersey Traction Co., 57 N. J. L. 463, 31 Atl. Rep. 1038, a street car was held to be a "machine of highly dangerous character."

In a former decision of this cause by this court we said: "The owners of automobiles in this State are bound to observe statutory regulations of their use and assume liability commensurate with dangers to which the owners or their agents subject others in using the automobiles on the public highway. The principles of the common law do not permit the owner of an instrumentality that is not dangerous *per se,* but is peculiarly dangerous

in its operation, to authorize another to use such instrumentality on the public highways without imposing upon such owner liability for negligent use. The liability grows out of the obligation of the owner to have the vehicle, that is not inherently dangerous *per se,* but peculiarly dangerous in its use, properly operated when it is *by his authority* on the public highway. In view of the dangers incident to the operation of automobiles and of the duties and obligations of the owners of motor vehicles under the statutes of the State, it could not be said that on the facts of this case no question was made for the jury to decide." Anderson v. Southern Cotton Oil Co., 73 Fla. 432, 74 South. Rep. 975.

The distinction there drawn was that an automobile, like a locomotive or a trolley car, has no inherent elements of danger, but that it is peculiarly dangerous in its operation and use on the public highways.

Much confusion has resulted from the use by the courts and text writers, of a term so inadequate and unfit as *"dangerous per se"* in discussing the liability of the owner of an instrumentality that is peculiarly dangerous in its operation, who permits another to run it on the public streets and highways.

Wild animals and high explosives are dangerous *per se;* that is, they may inflict injury without the immediate application of human aid or instrumentality. Neither a locomotive, a trolley car nor an automobile is dangerous *per se*—by or through itself—in that neither can inflict injury to a person except by its use or operation. A locomotive in the roundhouse, a trolley car in the barn, an automobile in a garage are almost as harmless as canary birds; but in operation they are dangerous instrumentalities, and the master who intrusts them to another to oper-

ate—the one on its right-of-way, the others on the public highways—cannot exonerate himself from liability for injury caused to others by the negligence of those to whom they are entrusted. As said in Barmore v. Vicksburg S. & P. R. Co., *supra*:

"The servant is empowered by the master to discharge certain duties, and it is incumbent upon him to exercise the same care and attention which the law requires of the master; and if that care and attention be about the management and custody of dangerous appliances, the master cannot shift the responsibility connected with the custody of such instruments to the servant to whom they have been entrusted, and escape liability therefor. This rule arises from the absolute duty which is owing to the public by those who employ in their business dangerous agencies or appliances, engines, or instruments liable, if negligently managed, to result in great damage to others."

We are not unmindful that a goodly number of courts lay down a different rule, but their conclusions are not persuasive, because they ignore the dangerous character of the automobile as operated on the public highways, and treat it as a machine at rest.

Huddy on Automobiles, Sec. 36, says: "It is believed to be *a common opinion among many that the automobile constitutes a dangerous machine,* and that the operation of the motor vehicle on the public thoroughfare is necessarily hazardous." This, he says, "is a mistaken view." It is rather dogmatic to set up one's individual opinion against the "common opinion among many" on a subject on which the "many" are capable of forming an intelligent opinion. It is also difficult to understand why some courts, in deciding whether or not an automobile is a dangerous machine—which, after all, must be determined

by common knowledge based upon general experience—should announce an opinion at variance with "the common opinion among many."

A judicial opinion on established facts and well-known conditions, counter to the common opinion of the many on the same subject is persuasive only to those who desire to accept the unreasonable and reject the obvious.

The quoted passage from Huddy is found in all the editions of his work, but the first edition contains the data upon which he bases his opinion, that the automobile is "not a dangerous agency," that is omitted in all later editions. He says, "As bearing on this question, it has been stated by authority that out of a total of 3,482 deaths reported to the coroner's offices in the city of Chicago for the year 1905, only five were caused by automobiles. For every death caused by automobiles in the city of Chicago there were more than seventy deaths caused by railroad accidents."

That was in 1905. In its weekly news-letter of March 22nd the National Safety Council, an organization that is doing a vast work to prevent accidental injuries in the United States, gives what purports to be figures from reports from the coroner showing fatal accidents in Cook County as follows: In 1918, automobiles 374, railroads 318, and street cars 146; in 1919, automobiles 420, railroads 208, street cars 132. Thus in 1918 there were 56 more deaths from automobiles than from railroads, and in 1919 there were 212 more deaths from automobile accidents than from railroads, and 33 more than from railroads and street cars combined. From 1905 to 1920 the number of deaths from railroad accidents diminished from about 350 to 209, while in the same period deaths from automobiles increased from 5 to 420.

The U. S. Census Bureau in its bulletin published Feb. 2, 1920, places the number of deaths in the United States in 1918 from "Automobile accidents and injuries," at 7,525—a close second to deaths from "railroad accidents and injuries," which during the same period were 8,610; and more than three times as many as those caused by "street car accidents," which were only 2,366.

The Census Bureau makes this comment on automobile accidents: "Deaths from automobile accidents and injuries in 1918 totaled 7,525, or 9.2 per 100,000 population. This rate has risen rapidly from year to year, which strongly suggests the need for better traffic regulations and better enforcement of those we now have."

The National Safety Council has this to say: ''The following three facts emphasize the seriousness of automobile hazards:

''1. In 1919 there were approximately one-half as many people killed by this one machine alone as were killed accidentally in all industries, mines and railroads.

"2. While the industrial hazards are coming under control and methods of prevention are pretty well standardized, accidental deaths on the streets are mounting by leaps and bounds, and very little has been done to date in the way of an organized effort to control this hazard.

"3. Whereas, only a portion (possibly ¼) of the total population in the United States is exposed to the hazards of industry, practically every man, woman and child the moment they leave their doors are exposed to the automobile hazards."

''We say the automobile has become the most deadly machine in America because the mortality report of the

Census Bureau and statistics being received daily by the National Safety Council indicate that during recent years automobile accidents have resulted in approximately one-half the number of deaths caused by industrial accidents of all sorts. In Chicago 420 persons were killed in automobile accidents during 1919; in Cleveland, 136; in St. Louis, 97; in the Borough of Manhattan, New York, 191 children under fifteen years of age were killed by automobiles, and in Greater New York, 677 persons were killed by automobiles in one year. In Rochester, N. Y., as many deaths were caused by automobile accidents as by street cars, railroads and industrial accidents combined. Even more alarming than these statistics is the fact that in almost every case a comparison, year by year, of the number of automobile deaths and the number of automobiles in use indicates that the deaths are increasing in almost exact mathematical ratio with the increase in number of automobiles."

However cleverly the courts may state the reasons why they think the automobile in operation on the streets and highways is not a dangerous instrumentality or agency, these statistics afford a compete refutation.

In view of the greatly increased number of deaths from automobile accidents since Mr. Huddy in his first edition gave the statistics upon which he based his conclusion that the automobile in operation on the public highways is not a dangerous machine, his dictum loses whatever weight it might have had, and suggests the inquiry why he adheres to it?

Perhaps a reply to this, and to the distinction sought to be drawn between locomotives and automobiles as dangerous agencies, may be found in Mr. Babbitt's work on

Motor Vehicles, Sec. 322, where he naively says: "An examination of the cases of the last five years discloses that the increasing popularity of motor vehicles has had its effect on the courts with the result that all the decisions of that period are unanimous that a motor vehicle is not in the class of dangerous agencies." We question, however, his premises and his conclusion. What most of the courts hold, is that it is not dangerous *"per se,"* thus merely asserting the obvious, and begging the question by seeking to negative what no one asserts; for we are not dealing with the machine at rest, but in operation on the streets and highways.

Upon this proposition we quote from Barmore v. Vicksburg, S. & P. R. Co. *supra.*

"An attempt has been made, in a very few illogically reasoned cases, to draw a distinction between instrumentalities 'dangerous in themselves,' and those 'dangerous by reason of improper use,' and confine the master's liabiity to cases due to mismanagement of the former class alone. An analysis will show that the distinction is more imaginary than real, and too refined to be of any practical benefit as a method of determining legal responsibility. The argument has a degree of plausibility when limited to agencies inherently dangerous even when most carefully handled, such as dynamite and similar substances, as distinguished from those of like character, such as gasoline, naphtha and the like, only dangerous when proper precautions are not observed; but the sophistry of the argument becomes apparent, and refutes itself when we come to the consideration of dangerous engines, machinery or appliances. No appliance is 'dangerous of itself,' but practically every appliance may become 'dangerous by improper use.' Neither a locomotive, pile-

driver, electric or cable car, automobile, threshing machine, or team and wagon, is 'dangerous of itself,' yet with practical unanimity the courts hold the master liable for damages caused thereby, even though the servant who has the sole custody and control thereof is at the time acting wilfully, wantonly and in disobedience to his master's order. And so, on the other hand, an ax, a crowbar, a scythe, and similar implements in daily use, are equally as deadly when improperly used, but no court would hold a master liable for the tortious act of his servant on the ground alone that he had intrusted the custody of such appliance to the servant. No appliance when at rest is 'dangerous in itself.' It is by operation alone that it becomes capable of causing injury. So, in our opinion a better test, though probably not itself without exceptions, of the master's liability, would be whether the agency or appliance, the custody and control of which he committed to his servant's judgment and discretion, was 'dangerous in itself,' or liable to inflict serious injury to others, when operated in the customary method of use, and while being devoted to the purposes for which it was designed. If so, the public safety demands that he shall be answerable for the exercise of his servant's judgment. We are not without eminent authority for this position. 'Whenever a master sends his servant out beyond his own eye and immediate control, in the custody of any species of property of the master which, unless properly cared for, guarded and used, is liable to work injury to third persons, it is necessarily a part of the duty which the master commits to the servant to so care for, guard and use such property that it shall not work such injury.' 1 Thomp. Neg. Sec. 589; Vicksburg & J. R. Co. v. Patton, 31 Miss. 156, 66 Am. Dec. 552; Nashville & C. R. Co. v. Starnes, 9 Heisk. 52, 24 Am. Rep.

296; Philadelphia & R. R. Co. v. Derby, 14 How. 468, 14 L. Ed. 502; Salisbury v. Erie R. Co., 66 N. J. L. 233, 55 L. R. A. 578, 88 Am. St. Rep. 480, 50 Atl. 117."

The Florida statutes require motor vehicles to be regis-tered—the application for registration to contain the name of the manufacturer, the styles, type and factory number of each vehicle, the character of motor power, and the amount of such motor power stated in figures of horse-power, the name, age, residence and business address of the owner of such vehicles, and a statement that he is over sixteen years of age. He is required to get from the Comptroller two number plates, which shall be con-spicuously displayed on the car; no person under fourteen years of age is permitted to operate or drive a motor vehicle unless accompanied by a duly licensed chauffeur, or by the owner of the motor vehicle; upon the sale of a registered motor vehicle the Comptroller must be notified of such sale; they are required to be equipped with ade-quate brakes in good working order; signaling devices must be provided; lights are required to be used at night and the manner of their use regulated; the rate of speed that they may be operated within or without corporate limits is prescribed; chauffeurs must be licensed, and they are required to pass an examination as to their qualifica-tions, to wear a distinguishing badge, and a penalty is attached for the violation of the provisions of the law. Chap. 7274, Acts of 1917.

It is idle to say that the legislature imposed all these restraints, regulations and restrictions upon the use of automobiles if they were not dangerous agencies which the legislature felt it was its duty to regulate and res-train for the protection of the public.

As was said in Ingraham v. Stockamore, 118 N. Y. Supp. 399, 63 Misc. Rep. 114: "It would seem, from these provisions in reference to the owners of automobiles and those who operate them, that the Legislature regarded automobiles as dangerous machines, and that their owners should be under special liabilities for the manner in which they operate them. No such restrictions have ever been imposed on other methods of transportation on highways. It is absurd to say that an automobile is no more dangerous than a team of horses. The latter have been used time out of mind, and comparatively few accidents have occurred, and those mostly to the ones using the horses. During the few years that automobiles have been in use, fatal accidents have been of almost daily occurence, and automobiles have come to be regarded in both city and country as a menace to people on the highway. Their rapidity and the stillness of their movements make them especially dangerous to pedestrians. Attempts have been made by law to limit their speed, but it has been impossible to enforce the law. No doubt the Legislature had in mind these facts when making the provisions of the Act. Such provisions, requiring the registra, tions of the names of the owner and chauffeur and the number of each machine, can have but one purpose—to enable identification of the persons responsible in case of accident.

"An automobile being a dangerous machine, its owner should be held responsible for the manner in which it is used; and his liability should extend to its use by any one with his consent. He may not deliver it over to any one he pleases and not be responsible for the consequences." Christy v. Elliott, 216 Ill. 31, 74 N. E. Rep. 1035; Commonwealth v. Boyd, 188 Mass. 79, 74 N. E. Rep.

255; Weil v. Kreutzer, 134 Ky. 563, 121 S. W. Rep. 471, 24 L. R. A. (N. S.) 557.

"While it is quite true that a motor is not an outlaw, it must also be borne in mind that the driver is not the lord of the highway, but a man in charge of a dangerous thing, and so called upon to exercise the greatest care in its operation." Fisher v. Murphy, 20 Ont. W. R. 201, 3 Ont. W. N. 150. See also Mattei v. Gillies, 16 Ont. L. Rep. 558, 12 Ann. Cas. 970.

Laws similar to Chap. 7275, Acts of Florida, have been sustained by the courts as a legitimate exercise of the police power to regulate agencies that are *dangerous to the public.*

Citations from a few will be enlightening.

"There can be no question of the right of the Legislature in the exercise of the police power to regulate the driving of automobiles and motorcycles on the public ways of the Commonwealth. They are capable of being driven at such a high rate of speed, and when not properly driven are so dangerous, as to make some regulation necessary for the safety of other persons on the public ways." Commonwealth v. Boyd, *supra.*

"The use of them introduces a new element of danger to ordinary travelers on the highways, as well as to those riding in the automobiles. In order to protect the public great care should be exercised in the use of them. Statutory regulation of their speed while running on the highways is reasonable and proper for the promotion of the safety of the public. It is the duty of the Legislature, in the exercise of the police power, to consider the risks that arise from use of new inventions applying the forces of nature in previously unknown ways. * * * In

choosing his vehicle, everyone must consider whether it is of a kind which will put in peril those using the streets differently in a reasonable way." Commonwealth v. Kingsbury, 199 Mass. 542, 85 N. E. Rep. 848.

"The statute in controversy in the case at bar certainly applies to all drivers of automobiles without distinction, and is, therefore, general as to that class, and, for the reason that such horseless vehicles constitute a source of danger to travelers upon the highway, it cannot be said that the classification is not a reasonable one." Christy v. Elliott, *supra.*

"It is scarcely necessary to say that this gives the common council ample authority to enact ordinances which will tend to make streets safe for the traveling public. We may take judicial notice that many of these automobiles may be driven at a speed of at least 40 miles an hour. Driven by indifferent, careless, or incompetent operators, these vehicles may be a menace to the safety of the traveling public. Under its authority to regulate the use of the streets, the city may enact ordinances which will diminish this danger. * * * It is merely a justifiable exercise of the police power in the interest of the safety of the traveling public." People v. Schnei-der, 139 Mich. 673, 103 N. W. Rep. 172.

"The purpose of the legislation is manifest. The Legis-lature appreciated the danger to pedestrians, and to people lawfully using the highways with vehicles drawn by animals, from automobiles and motor vehicles. Many of these vehicles are capable of attaining a speed of more than a mile a minute, and weigh several tons. This speed averages approximately the speed of the different classes of railroad trains operated by steam power." People v. MacWilliams, 86 N. Y. Supp. 357, 91 App. Div. 176.

. In this case it was contended that the statute was unconstitutional because it exempted manufacturers and dealers having automobiles in stock, from the operation of the law, thus discriminating against those who used them on the highways.

. The constitutionality of the act was sustained on the theory that while it was necessary for the public safety to require registration of motor vehicles operated on the public highways, it was "unnecessary to require the registration of such vehicles as were held in stock for sale or for repair or on storage in automobile barns and stables." In other words, that an automobile standing in a warehouse or garage is not a dangerous agency—that is "dangerous *per se*"—but when operated on the public highways it is a dangerous agency.

The courts seem to be unanimous on the proposition that for the purpose of the exercise of the State's police power the automobile in operation is a dangerous agency that requires stringent regulatory legislation in the interest of the public safety. Some courts, however, in suits for personal injuries caused by the same agencies, seem to apply a different rule, and hold that they are not dangerous contrivances from which the public is entitled to the protection that would be afforded by the application of the rule governing the liability of the owner of a dangerous agency who permits it to be used by another.

We cannot make that distinction. If the automobile operated upon the public highways is so dangerous to other users of the highways as to require its regulation and control under the police power, it is not divested of its dangerous character in an action for damages caused by the negligence of the operator, and it follows that the rule applying to other dangerous instrumentalities such

as locomotives and trolley cars should be applied to automobiles when operated on the highways.

The controlling facts in the instant case are undisputed. The car was being operated by an employee of the corporation, with the expressed or implied permission to use it. While attending to a purely personal matter he negligently drove it against the plaintiff in error, thereby causing the injury complained of.

In intrusting the servant with this highly dangerous agency, the master put it in the servant's power to mismanage it, and as long as it was in his custody or control the master was liable for any injury which might be committed through his negligence. This is the doctrine of the common law as applied to a new instrumentality eminently dangerous to the persons using the public highways.

Under the doctrine of this case we find no reversible error, and the judgment is affirmed.

We adopt the concurring opinion of Mr. Justice Whitfield.

TAYLOR AND WHITFIELD, J. J., concur.

ELLIS AND WEST, J. J., dissent.

WHITFIELD, J., Concurring.—The amended declaration herein alleges that the defendant's "automobile was being run and operated by its agent and servant in and upon the streets * * * with the permission of and by the authority of said defandant; * * * that while said plaintiff was riding on a motorcycle and proceeding with due care * * * said defendant's automobile being so

run and operated by its agent and servant and at a time and place and with the permission and authority of the defendant as aforesaid, and within the scope of his authority as such agent and servant  *  *  *  so carelessly and negligently run, drove and operated said automobile, *  *  *  that same violently came in contact with and did strike against with great force and violence, the leg, foot and ankle of plaintiff," etc.

In the absence of controlling statutes the principles of the common law in force in this State are applicable to the operation of vehicles on public highways.

The automobile or motor vehicle is an instrumentality of service whose weight, speed and mechanism make it peculiarly dangerous when in operation on public highways.

Among the principles of the common law that are designed to conserve the public safety, are those that require the exercise of due care in the use on the public highways of instrumentalities that are peculiarly dangerous in their operation, and impose upon the owner of such an instrumentality liability to persons for injuries to them proximately caused by the negligent use of the instrumentality upon the public highways by any one who has the authority or permission of the owner to use or operate it. These principles are applicable to the use of any instrumentality that may be produced by human skill which materially increases the hazards of travel upon the public highways; and the liability of the owner is not limited to the negligence of an employee of the owner while acting within the scope of his employment, but extends to the negligence of any one who uses such instrumentality upon the public highways with the authority or permission of the owner.

The amended declaration is manifestly drawn on this theory, and the charges of the court comport with this view of the issues and the evidence in the case.

The principles of the common law when applicable, have the force of law, particularly where, as here, the common law of England is by statute expressly incorporated into the laws of the State. A statute may be merely declaratory of the principles of the common law.

. The application of the principles of the common law to this case is not contrary to, but is consistent with, statutory regulations of the use of motor vehicles on the public highways in this State.

ELLIS, J., dissenting.

The declaration in this case, consisting of two counts, rests upon the theory that the Southern Cotton Oil Company, a corporation, defendant below, through its "agent and servant," negligently operated an automobile, owned by the defendant, upon the streets of Pensacola so that the plaintiff was injured.

The first count alleges that the automobile was "being run and operated by its (the company's) agent and servant in and upon the streets of the City of Pensacola, County of Escambia, State of Florida, with the permission of and by the authority of said defendant in transporting himself from his lunch in said city to his place of employment, to-wit, the place of business of said defendant," and that while the automobile was being "so run and operated" by the defendant's agent and servant, "and at a time and place and with the permission and authority of the defendant as aforesaid, and within the

scope of his authority as such agent and servant, to-wit, in transporting himself back to the place of business of said defendant," he carelessly and negligently drove and operated the automobile so that the plaintiff was injured.

The second count alleges that the defendant, the owner of the automobile, "was by its agent and servant driving, operating and conducting same on and upon the streets of the City of Pensacola, County and State aforesaid," and that while the plaintiff was riding a motorcycle at the intersection of Garden and Donelson streets in the city and proceeding with due care, the "defendant by its agent and servant so carelessly and negligently drove, managed and operated said automobile" that the plaintiff was injured, etc.

The case was tried upon the general issue of not guilty, which denied the wrongful act alleged to have been committed by the defendant. See Rule 71, Law Actions.

The facts in the case are undisputed and are set forth in the dissenting opinion in the first decision of this case. See Anderson v. Southern Cotton Oil Co., 73 Fla. 432, 74 South. Rep. 975.

Upon the second trial the evidence was much clearer that Barrow, the company's cashier, in using the automobile was merely required to make daily trips to the City of Pensacola from the offices of the company, which were located some distance out on Palafox Street, attend to the banking and shipping for the company and after getting lunch for himself return to the company's place of business about one o'clock. That the trip for the young lady took him some distance away from the line of his route back to the offices of the company. In fact in making this trip he was required to leave Palafox

Street, go out some distance on 'Garden Street, return to
Palafox Street to a point farther away from the offices
than where he had eaten his lunch.  After arriving at the
young lady's house he undertook an errand for her which
carried him further away.  Upon this latter trip the acci-
dent occurred.

The local manager of the company knew that Barrow
had frequently before that time used the automobile to
take the young lady to her work, but Barrow had never
before undertaken in the automobile an extra or special
mission for the young lady.  The local manager nor any
one else for the company had authorized Barrow to make
such use of the machine in performing errands for the
young lady, or in indulging in his own inclination to be
of service in taking her from her house or boarding place
to her work.

Now the declaration being framed upon the theory that
the wrongful act of the company's cashier, Barrow, casts
upon the company liability for the injury, it becomes
necessary to a recovery for the plaintiff to show that the
wrongful act of Barrow was done in the cause and within
the scope of his employment as the company's agent. That
issue was the one presented, the only one tried.

The majority opinion upholds the verdict and judgment
upon the theory that one who permits another to use an
instrument dangerous in its operation is liable in damages
for the negligent operation of such instrument, notwith-
standing the user was engaged upon an independent
errand of his own.  But that is not the theory upon which
the declaration was framed, nor the cause tried.  That
was not the case made by the pleadings; nor was it the
principle upon which the charges given by the trial court
to the jury was framed.

30—Vol. 80

The view of the judge who tried this case seems from the instructions given to have been that if the defendant's manager knew of Barrow's practice in using the automobile to take the young lady to her work and asquiesced in such practice, then Barrow's departure from his line of duty on the day of the accident could not be considered as an abandonment of his employment, but that he was still acting in the defendant's interest and within the general scope of his authority.

The judgment should not be affirmed upon the theory that the automobile being a dangerous instrument in operation, the defendant must be held liable for any injury resulting from carelessness on the part of one to whom it may have been entrusted as a kind of tort feasor, because no such case was presented to the court. There should be a recovery only upon the principle of *Respondeat Superior* because such is unmistakably the doctrine upon which the declaration rests. To hold otherwise is to reverse the doctrine so often announced by this court that the recovery by plaintiff must be upon the case made by the pleadings.

There may be cogent reasons why the Legislature should impose upon the owners of automobiles the additional liability for injuries caused by the machine when carelessly operated by any person to whom the owner may have entrusted it for the former's pleasure and not the owner's interest, but until the Legislature in the exercise of police power for the public safety so declares, the court should not outstrip the lawmaking body in its effort to meet public opinion.

. Nor do I think the judgment should be affirmed upon the theory announced by the trial court in the charge to which I have referred, because the evidence in my opinion

establishes beyond peradventure of doubt that Barrow was upon an independent errand of his own, or more accurately an independent errand or business of the young lady in whose service he was then acting when the acident occurred.

WEST, J., concurs.

### On Petition for Rehearing.

PER CURIAM.—On an application for rehearing it is contended that the effect of the former opinion herein as the law of the case has been overlooked on this writ of error, and that this "court departed from the doctrine announced by it upon its former decision in this same case." In our former decision we applied the dangerous agency or instrumentality rule, and the defendant in error filed a petition for rehearing in which he said that "this court in holding in the instant case that the dangerous instrumentality or agency rule applies to automobiles in Florida" "overlooked the decision of the courts establishing that an automobile is not a dangerous instrumentality or agency." The greater part of the petition was devoted to the discussion of that, as "the doctrine of the case," and we were asked to depart from it on rehearing. The petition for rehearing was denied. A judgment for the plaintiff below on another trial being affirmed by this court, a rehearing is now asked on the ground that this court "departed from the doctrine announced by it upon its former decision in this same case."

There was no departure from the doctrine of the first case. In both decisions we applied the rule that the superior must respond in damages for the negligent acts of

persons to whom he intrusts instrumentalities that are dangerous *per se* or dangerous in their use.

In the first petition for rehearing counsel complained that this court held that "the dangerous instrumentality or agency rule applies to automobiles in Florida." They now say, that in the last case wherein we adhered to that rule, that this court "departed from the doctrine announced by it in its former decision in this same case." We call attention to this inconistency, but refrain from making any comment on it.

Even if the declaration contains allegations that have reference to the doctrine of *respondeat superior* as applied to the relation of master and servant, the liability under such doctrine is not foreign to the rule of liability that one who authorizes and permits an instrumentality that is peculiarly dangerous in its operation to be used by another on the public highway, is liable in damages for injuries to third persons caused by the negligent operation of such instrumentality on the highway by one so authorized by the owner.   If the plaintiff alleged and endeavored to prove more than was necessary to a recovery of damages, the unnecessary matters may be regarded as immaterial surplusage, where they are not repugnant to or destructive of a right of action that is in substance and legal effect alleged and assumed to be proven, as is the case here.

The former opinion herein clearly indicates this situation in the trial then reviewed and the petition for rehearing then filed in effect complained of this pronouncement in the first opinion.

It is the province of the courts to determine whether an instrumentality of known qualities is so peculiarly

dangerous in its operation as to invoke the principle of law that the owner thereof is liable for injuries to third persons proximately resulting from the negligent operation of such instrumentality by any one using it with the authority of the owner. And when the court determines that the instrumentality is within the class and principle referred to, that phase of the case is concluded. The question then of liability *vel non* for the particular injury depends upon an appreciation of the evidentiary matters and the principles of law applicable thereto. Error, if any, in determining the peculiarly dangerous character of the instrumentality or in adjudicating liability in a particular case, may be remedied by permissible review proceedings.

The legal rules of liability for the authorized use of peculiarly dangerous instrumentalities are especially applicable to the negligent operation on the public highways, of motor vehicles whose weight, speed and mechanism render the negligent or inefficient use of them perilous to the public who have a right to travel the highways without being subjected to undue dangers of injury by others. If a locomotive engine and a hand car are peculiarly dangerous when operated on a railroad track, certainly a motor car is peculiarly dangerous when operated on public highways. The declaration and the evidence show liability under the law for negligence in the authorized operation of a motor car on the streets.

Even if the allegations and proofs do not show a liability because of the negligence of the defendant's employee while engaged in the scope of his *employment,* both the allegations and the proofs do show liability for an injury caused by the negligent operation on the highway of an instrumentality that is peculiarly dangerous

in its use, by the defendant's employee while acting with the *authority* and permission given by the manager of the defendant corporation, the owner of the instrumentality having the control of its use. The liability arises for negligence within the scope of *authority,* if not also within the scope of *employment.* This appears in the former opinion.

Rehearing denied.

BROWNE, C. J., AND TAYLOR AND WHITFIELD, J. J., concur.

ELLIS AND WEST, J. J., dissent.