CRENSHAW BROS. PRODUCE CO., INC., v. JOHN T. HARPER, JR.; CRENSHAW BROS. PRODUCE CO., INC., v. JOHN T. HARPER.

194 So. 353
Division B
(Two Cases)
Opinion Filed February 23, 1940
On Rehearing March 15, 1940

28

30

*Shackleford, Farrior & Shannon,* for Plaintiff in Error; *Worth, Bivens & Lively,* for Defendant in Error.

BROWN, J.—These two cases, which have been consolidated for the purpose of argument and disposition here, involve an important question. This question as we see it is the controlling question in both cases. It is this: Where a corporate employer places one of its employees in exclusive control and supervision of the operation of a dangerous instrumentality, such as a heavy automobile truck, for operation by such employee upon the public highways in the business of employer, and also places such employee in direction and control of a student helper required by the employer to ride on its said truck, is such

employee, in his management of said dangerous instrumentality, a fellow servant with the student helper under his direction, or a vice-principal of the employer?

The plaintiff in one of· these cases was John T. Harper, Jr., and the plaintiff in the other case was John T. Harper, Sr. The Harper, Jr., suit was against the Atlantic Coast Line Railroad Company, a corporation, and Crenshaw Bros. Produce Co., Inc., a corporation. The Harper, Sr., suit was against the Produce Company, alone. John T. Harper, Jr., who was nineteen years of age when his injury occurred, in his action, sought recovery of damages for his serious personal injuries, alleged to have been occasioned by the concurrent negligence of the defendants. The action filed by his father, John T. Harper, Sr., was brought to recover damages sustained by him by reason of the injuries to his son, consisting of the cost of hospitalization charges; medical and surgical treatment; the loss of time from his work caused by the care, nursing, and cost of transportation of his son to and from the hospital and doctor's offices at various times, and the loss of earnings of his said son during his minority, etc.

The suit brought by John T. Harper, Jr., resulted in a verdict and judgment against Crenshaw Bros. Produce Co., Inc., in the sum of $3,000.00. The suit brought by the father resulted in a verdict and judgment in his favor against Crenshaw Bros. Produce Co., Inc., in the sum of $800.00. Both verdicts and judgments were rendered on the same day, which was February 12, 1938. The verdict in the case brought by John T. Harper, Jr., while finding for the plaintiff against the defendant Crenshaw Bros. Produce Co., Inc., in the sum of $3,000.00, expressly found the defendant Atlantic Coast Line Railroad Company not guilty. The judgment rendered that same day in that case

was in favor of the plaintiff and against the defendant Crenshaw Bros. Produce Co., Inc., in the sum of $3,000.00 and costs, but did not dispose of the case as against the Atlantic Coast Line Railroad Company.

Writs of error were sued out in each of these cases by the defendant Crenshaw Bros. Produce Co. and after the cases had thus been brought to this Court supplemental transcript of the record was filed showing that the court below had later entered a judgment *nunc pro tunc* disposing of the Harper, Jr., case as against the Atlantic Coast Line Railroad Company by adding to the former judgment a paragraph to the effect that the plaintiff "do have and recover nothing of the defendant, the Atlantic Coast Line Railroad Company, a corporation," and that said corporation "do go hence without day." In this connection it was shown that this amendment was made by the consent of the parties to remedy an oversight by the court in its former final judgment and to which action of the court no objection was made and the supplemental transcript showing this *nunc pro tunc* entry was filed in this court by a stipulation of counsel.

The collision between the motor truck and the train which caused the injuries to John T. Harper, Jr., occurred on March 22, 1935. The employment in which he was then engaged had comprised a period of some four or five weeks, but he only worked about one day out of each week, not being steadily employed, but making trips when directed to do so by Mr. Allen, acting for Crenshaw Bros. Produce Co., as a student helper for which he was paid $1.50 per trip. He had been employed on a previous occasion, during the year 1934, in the same kind of a job by said defendant for a period of nine or ten months. During his first, as well as his second, employment, plaintiff would report at the

warehouse at whatever time Mr. Allen told him to, and help load different trucks. After trucks were loaded, Mr. Allen would put him under a truck driver to go out and assist in making delivery of merchandise, and he assisted the driver in delivering the merchandise at the various stores at which they stopped. Mr. Allen would tell the assistant deliverymen .of whom there were three or four, which truck they were to go out on each morning and the time they were to report each morning. During each period of employment he worked about one day per week. Mr. Allen was general manager for the defendant corporation. Plaintiff made application for a job as truck driver, which was refused him, but Mr. Allen gave him a job, "as an extra man to learn how to handle the trucks." Plaintiff testified that Mr. Allen told him to learn how to drive a truck; how to load the truck; the different routes and the customers; that he was promised a job as a truck driver "after he had learned," that his duties were nothing more than that of "a student." That he went out over various routes from time to time as designated by Mr. Allen and that he had been over the particular road which they were driving on the day of the accident on numerous occasions before that day and that he went out with the driver, Harry Grimes, more than any of the other drivers, and that he assisted in the driving of the truck whenever the driver told him to do so. That Mr. Allen told him to do what the driver said, while he was on the truck with the driver, and that he drove the truck only on particular occasions when the driver instructed him to do so, and that it was not his duty to watch out and help the driver when the driver drove. That he had been directed to go with and learn from Harry Grimes more than from any other driver, although there were eight or nine deliverymen working for

the defendant. That Mr. Allen was in charge of all the truck drivers and their assistants and did all the hiring and discharging.

Plaintiff testified that he left Tampa on the morning that the collision occurred in a truck driven by Harry Grimes headed for Pinellas County; that they made stops in Safety Harbor and after leaving there had stopped to assist a man having car trouble. That after leaving this man with the broken car, plaintiff had gone to sleep. Before he went to sleep, Grimes, the driver, had crossed two railway tracks and at each of these he had stopped the truck before going across the grade crossing. At the time plaintiff went to sleep he was sitting on the right-hand side in the cab with his feet braced against the dash board and with his head resting back in the corner. It was then a little after six o'clock and not then daylight. That the next thing he knew, he came to consciousness in a hospital in Clearwater. The accident, as shown by other testimony, occurred when the truck was proceeding at a speed of about ten or twelve miles per hour in a Westerly direction in the town of Largo. The train was proceeding only twice the speed of the truck. There was some obstruction to the view of the driver upon approaching the track, until within about forty feet of it, but the train had made the usual station blow, and testimony of the engineer and fireman was to the effect that as the engineer approached the crossing the bell was ringing and the air whistle blowing. This testimony was supported by that of several other witnesses who were not employees of the Railroad Company. One of the witnesses, Louis Truby, an employee of the Government to carry the mail to and from the trains, had gone to the platform and was reading the morning paper when he heard the train blow and heard it approaching. He was an eye witness to the

collision. He said that the truck was evidently in low gear and was going about twelve miles per hour and that he saw it approaching the crossing and tried to draw the driver's attention to the fact by holding up his hand and calling, and that the driver could have seen him had he been looking in his direction. He called to the driver several times as loud as he could, when the truck was about forty feet from the main track. That the sun was then up and if the driver had heard him or seen him, in his efforts to direct his attention to the fact that he was in a precarious position, he could have stopped the truck before getting on the track. But the driver came on at the same rate of speed and the engine struck the cab of the truck and it was bounced and pushed down the track a distance of about 250 feet. Several witnesses testified that they heard the air whistle and heard the bell ringing after the train had come around the curve and was approaching the station.

Mr. O. T. Allen, witness for the defendant, testified that he was sales manager for Crenshaw Bros. Produce Co. and that it was his duty to hire the employees necessary to handle the transportation and delivery of the company's merchandise; that the deliverymen get up the list of orders for particular runs and each is assigned to make the deliveries, and as a rule to do the driving. That the assistants to the deliverymen help in any way that was necessary to get rid of the load; that they did not work regularly but only on the heaviest days, Mondays and Fridays. That they helped to load the merchandise on the trucks and go out on the trucks. That he, Mr. Allen, designated the routes to be taken by each particular driver and the assistant to go with him. That after an assistant learned the routes and the merchandise there was no occasion for the driver to exercise any authority over him; that he employed

Harry Grimes after making inquiries as to his experience in driving motor vehicles. This was in 1934. Later on he was, after he had been working as an assistant deliveryman for some time, considered capable, and was appointed as a regular deliveryman. That he had employed the plaintiff as an assistant deliveryman for several months in 1934 and on the occasion of his second employment he, Allen, designated the particular routes that Harper would take on the various days that he went out. That he went out most frequently on the West Coast route with Harry Grimes. That Grimes had been a truck driver from September, 1934, up to the time of the accident. That the authority of the truck driver over his helper was that of "an instructive nature." That truck drivers went to work as a rule from 12 o'clock midnight to 1 o'clock P. M. That Friday was the longest and hardest day, and that it was on Friday that this accident occurred. That both plaintiff and Grimes had reported for duty at midnight; that if they were lucky and had no trouble they might expect to finish at 2 or 3 o'clock that afternoon; that the trucks they drove were built for carrying as heavy a load of produce as the law would permit. That so far as the witness knew, plaintiff never drove a truck for the defendant, and that it was up to the driver to decide if and when the helper should drive. That Grimes' work as a truck driver during his employment with the company was good.

Harry Grimes testified that on the morning of the accident he and plaintiff were on the West Coast route and left the warehouse about 5:35 a. m.; that they stopped for coffee and doughnuts and then proceeded to Safety Harbor. That after leaving Safety Harbor they continued on towards Largo; that after they got about half way to Largo, Harper told him that he was pretty tired out as he had been up all

night before and was trying to get a nap and that he leaned back on the seat apparently trying to sleep. That his eyes were closed and that they had no further conversation. That in going into Largo there were a number of tracks to cross that were rough; that these tracks were about 300 feet from the location of the Atlantic Coast Line tracks where the accident occurred; that as he came to these tracks he shifted into third gear, which is equivalent to second gear on a passenger car; that he did not see or hear anything, after almost stopping, so he crossed the first tracks and continued in the same gear; that on the right hand side there was a filling station and a vacant space farther back with houses and trees which shut off the view on that side, and there was a warehouse forty-five feet from the middle of the second set of tracks. He was still in third gear when he came to the warehouse and was going slightly over ten miles per hour; that after he cleared the warehouse, and just before he looked to the right, he felt a vibration, and then looked to the right and saw the locomotive approaching him. That at that time the front part of the truck was on the track. That he pushed down on the accelerator, trying to get as much of the truck across the tracks as possible before the actual collision; that he had not heard any warning signal from the train at that time. The windows were closed, that is, they were up. That before going to work with Crenshaw Bros. he had driven an automobile since he was sixteen years of age; that after passing the building he did not look towards the right until his truck was on the track. Grimes testified that he was twenty-two years of age at the time of the trial, which would make him about the same age as young Harper. It appears from his testimony that while he came to almost a complete stop before crossing the tracks a few hundred feet from where the collision occurred, at the crossing where the collision

did occur, he first looked in the direction from which the train was coming when his truck was already on the track and the train was bearing down on him only twenty-five feet away, and what caused him to look at this time was a vibration felt rather than a warning heard.

The injuries suffered by plaintiff from this collision were serious. His jaw and leg bones were broken and his pelvic bone crushed and he suffered much pain during the two months treatment in the hospital, which pain was by no means ended when he was removed to his home. His leg had to be re-broken and re-set. He was in a cast from March to September, in bed until December, and in a wheel chair until the following May, and on crutches for some months thereafter. At the time of the trial, three years after the accident, he could walk with a limp only about one mile without sitting down to rest. That his knee would still not bend. That he would never be able to hold down a job unless it would be one at which he could sit, for which kind of work he was not trained.

The testimony of the plaintiff's physician was to the effect that plaintiff's pelvis was permanently deformed and that he would never be able to do any work which required much walking. That while one leg was withered and slightly shorter than the other, it might fill out and become normal in size in the course of time.

The issues as made by the pleadings were substantially the same in both actions, with the exception that in the suit brought by the father, there was only one defendant, the Produce Company, and he sued, not for injury to himself, but for damages alleged to have been suffered by him as the result of the injuries to his son.

The declaration in the Harper, Jr., suit claimed damages for injuries received by him alleged to have been caused by

the concurrent negligence of the defendant Produce Company in the operation of its truck, a dangerous instrumentality, and the Railroad Company in the operation of its train, while negligence caused stated injuries to plaintiff, who was riding on the truck as a subordinate employee of the Produce Company. The defendant Produce Company filed pleas (1) of the general issue, (2) denying that the truck was operated by any one acting as its vice-principal or in a representative capacity, (3) assumption of risk, (4) that the plaintiff and the driver of the truck were fellow servants, and also several pleas of contributory negligence on the part of the plaintiff.

The case was tried before a jury upon said issue, as well as upon certain issues formed between plaintiff and the Railroad Company. At the conclusion of the plaintiff's evidence, as well as at the ·conclusion of all the evidence, motions for directed verdict were interposed and denied. The jury returned a verdict against the Produce Company in the sum of $3,000.00 and found the Railroad Company not guilty. Motion for new trial was made and denied, and judgment entered for plaintiff. Only three assignments of error were made by defendant Produce Company; first, that the court erred in denying its motion for directed verdict at close of plaintiff's case; second, the denial of a like motion at the close of all the evidence, and third, the denial of the motion for new trial. But these brief assignments go to the heart of the case, and form a sufficient basis for all the questions raised and discussed in the very able briefs filed in behalf of the respective parties.

It is suggested by defendant in error that this Court is without jurisdiction to review the judgment below because the transcript does not properly show the amendment to the final judgment disposing of the cause as to the defendant

Railroad Company; also that there is an absence of a necessary party in that the writ of error sued out by plaintiff in error, Crenshaw Bros. Produce Co., did not make said Railroad Company a party to such writ. It is true that the writ of error was sued out by the Produce Company, against whom alone the judgment had been rendered, so as to dispose of the case as to the Railroad Company, and before such *nunc pro tunc* amendment of the judgment had been brought to this court by the filing of a supplement to the transcript of record.

We do not think these contentions well founded. Section 4636 C. G. L. provides that proceedings in error shall be amendable as other proceedings (Harper v. Bronson, 98 Fla. 941, 124 So. 732) and paragraph "b" of common law rule 93 provides that:

"If, in the transcript, anything material to either party be omitted by accident or error, the appellate court, on a proper suggestion or on its own motion, may direct that the omission be corrected by a supplemental transcript."

This rule was adopted in 1936. Old Supreme Court Rule 14 provided that omissions in the transcript could be supplied by certiorari, or that the court itself might make an order directing the necessary return to be made or the paper or record to be supplied. Common Law Rule 93 provides a simpler method. In Gover. v. Mann, 114 Fla. 128, 153 So. 895, the late Chief Justice DAVIS, writing the opinion, said that Chapter 11890, Acts of 1927, now appearing as Sections 4635 and 4636, C. G. L., was "a highly remedial statute" devised and proposed by a special commission appointed by the Governor to recommend to the Legislature needful changes in matters of procedure. The filing of a supplemental transcript herein has been permitted upon a motion filed by plaintiff in error.

Furthermore, it was held in Stephens v. Bradley, 23 Fla. 393, 2 So. 667, that an amendment *nunc pro tunc* of the record of a case decided by the Circuit Court may be made by such court while the case is pending on appeal in this Court. In that case the Court also said:

"In the case at bar, the suit being in tort, and it being the rule that the jury might find a verdict and the court render a judgment against one or all or part only of the defendants, the fact that a verdict and judgment was only rendered against Stephens, was immaterial. In such a case the court would presume that the case had been discontinued as to the other defendants, or that the silence of the verdict and judgment as to part of them was a verdict in favor of the parties not mentioned."

Nor would a reversal of the judgment *against* defendant Crenshaw Produce Company disturb the judgment *in favor* of the defendant Atlantic Coast Line Railroad Company. A co-defendant in a tort action cannot complain of a verdict rendered in the other defendant's favor, because there can be no contribution among tort-feasors. If an injury be caused by the concurring negligence of two or more parties, each of them is liable to the injured party to the same extent as though it had been caused by his negligence alone. If a judgment for damages in a tort action be rendered against one and in favor of the other defendant or defendants, the only party to the case who has a right to complain of the verdict and judgment rendered in favor of the other party or parties is the plaintiff in the court below. This question is treated at some length in the opinion on rehearing in the case of Wolfe Construction Company v. Ellison, 127 Fla. 808, 174 So. 594. It would appear from these authorities that the plaintiff in error, Produce Company, had the right to sue out the writ of

·error for the purpose of reviewing the judgment rendered against it in the court below even if said judgment had not ·been subsequently amended *nunc pro tunc* so as to dispose ·of the case against plaintiff's co-defendant, the Railroad Company, which the jury had found not guilty.

·As was stated in the opinion in the Wolfe Construction Company case, a judgment, in a case of this kind, against one defendant and in favor of the other, as this judgment ·was after it had been amended *nunc pro tunc,* was separable and in effect two separate or several judgments. At most, a writ of error taken to the judgment ·by the only defendant *against* whom the judgment was rendered, makes the co-defendant in whose favor such judgment was rendered only a *proper* and not a *necessary* party. We have no doubt, therefore, of our jurisdiction to review the judgment below .rendered against the Produce Company on the writ of error as sued out and the original transcript of the record which was lodged here in due time; but if there had been any doubt on this score we think that doubt has been removed by the filing of the supplemental transcript.

Coming now to the merits, we think that the evidence is sufficient to prove that the injuries sustained by the plaintiff were proximately caused by the negligence of the defendant's truck driver. It follows that the judgments rendered against plaintiff in error in both cases must be affirmed unless some one or more of the defenses set up in the special · pleas interposed by plaintiff in error to the respective declarations were good in law as applied to the facts of this case and sustained by the evidence.

We will consider first the plea of assumption of risk. This plea was submitted to the jury under appropriate instructions. They found in effect that the nineteen-year-old plaintiff had not assumed the risk of the truck driver's

negligence in driving upon a railroad crossing immediately in front of an approaching train in broad daylight. We do not think the jury's findings on that point should be overturned. Plaintiff knew that the driver was familiar with the various railroad crossings which they would have to pass that morning and he knew, or must have known, that there was no reason why, with ordinary care, the truck could not be safely propelled across them. This driver had done so for many months, almost daily. He had been placed in charge of the driving of the truck by defendant because of their opinion that he was a safe, competent and careful driver. And they placed this young plaintiff under him for instruction. There was no evidence of any defect in the truck or any dangers incident to such defect. In a broad general sense, it might be said that all people, adults as well as minors, assume a certain amount of risk whenever they ride in any sort of motor vehicle, but all liability to passengers is not waived by reason of such general risk. In case of minors, ordinary risks are for evidential purposes treated at the outset of the inquiry as extraordinary and the burden of establishing the minor's comprehension of the particular risk is cast upon the employer. 3 La Batt, Master and Servant, Section 1203, page 3255.

Furthermore, this Court has held in many cases that the servant does not assume risks caused by the master's negligence, or the negligence of those for whom the master is responsible to the servant injured.

As to the general principle, see German American Lumber Co. v. Brock, 55 Fla. 577, 46 So. 740; Stearns & Culver Lumber Co. v. Fowler, 58 Fla. 362, 50 So. 680 and Smith v. Coleman, 100 Fla. 1707, 132 So. 198. In the case of Southern Florida Railway Co. v. Weese, 32 Fla. 212, 13 So. 430, this Court said that:

"Where a servant voluntarily engages in a service for another, and has full knowledge that the instrumentality he is to use and the situation in which the service is to be performed is dangerous, and the danger therefrom is apparent, and he makes no protest, and his employer does not mislead him in any way as to these matters, he assumes the risk *ordinarily incident* to that employment, and cannot recover from injuries resulting therefrom." (Emphasis supplied.)

Assuming that this young man knew that a motor truck in operation was a dangerous instrumentality, can it be said that the unnecessary and grossly careless propulsion of it on to a railroad track in front of a train is one of the risks ordinarily incident to the employment? We hardly think so. As to the applicability of the fellow-servant rule, we will discuss later.

There are many cases in the books dealing with defects in tools and machinery known to the servant in advance and which he could have comprehended and assumed, but here the truck collided with the train solely because of the negligent manner in which it was driven. We cannot say as a matter of law that on the facts of this case the plea of assumption of risk was sustained by the evidence. The jury held that it was not. We must let it rest at that.

Pretty much the same situation exists with reference to the plea of contributory negligence, which also was submitted to the jury with appropriate instructions. There is no complaint as to the instructions. The question here seems to be whether or not the plaintiff was guilty of contributory negligence in going to sleep in the motor truck shortly prior to the collision.

Notes on the subject of whether a passenger is guilty of negligence in going to sleep in an automobile will be found

in 9 A. L. R. 990; 63 A. L. R. 1436; 18 A. L. R. 317. See also 47 A. L. R. 293, 41 A. L. R. 767; 63 A. L. R. 1432; 40 A. L. R. 1341.

Undoubtedly, a person riding in an automobile which is being driven by another is not absolved of all personal care for his own safety, but is under a duty of exercising such care as an ordinarily prudent person would exercise under like circumstances. But the trend of authority would not authorize us to hold that it was negligence as a matter of law for an occupant of an automobile, who has no reason to distrust the driver's ability, to fall asleep while the automobile is in motion. This question must to some extent turn upon the facts of the particular case.

A large number of cases have been cited by counsel for the respective parties, dealing with this question, but we are unable to say that this nineteen-year-old boy was guilty as a matter of law of contributory negligence in going to sleep on this occasion. The truck was being driven by an experienced driver and under the circumstances he had reasonable cause to believe that his teacher, the driver, could be trusted to run the truck just as safely without his help as with it, and there was no objection on the driver's part when he said that he was going to take a nap. It may be that a state of facts might exist which would show that a passenger in an automobile or an assistant to the driver should be on the *qui vive* and might be guilty of contributory negligence if he went to sleep. But we do not think this is one of them. Again, we cannot say that the jury's conclusions from the evidence on this question is contrary thereto and should be set aside. In this connection see Seaboard A. L. Ry. Co. v. Watson, 94 Fla. 571, 113 So. 716, which while not directly in point, has some bearing on the question.

In Lindsay v. Thomas, 128 Fla. 293, 174 So. 418, it is cited to the effect that:

"No liability is predicable on an injury when it appears that the injured person's actual or implied knowledge of danger causing injury surpassed or equalled defendant's knowledge when the peril arose."

But the peril did not arise here until the driver, Grimes, drove the truck in front of the on-coming train. At that time Grimes was awake and saw or ought to have seen the peril. Plaintiff was asleep. So Harper's knowledge of the danger did not surpass or equal that of Grimes when the peril arose.

We are not here concerned with the "safe place to work" doctrine. It appears that this young plaintiff had instructions from the defendant at the time of his employment to follow the driver's directions while he was on the truck; but it is not made to appear that it was any part of his duty to assist in manipulating the truck or to assist the driver in maintaining a lookout. He had no control over the truck. The truck had been carefully operated, stopping at all railroad crossings before he fell asleep, and the driver acquiesced in his helper's going to sleep. So, we are not able to say that plaintiff was guilty of contributory negligence as a matter of law, under the facts of this case. The jury's verdict should not be disturbed on this ground.

We now come to the plea alleging that the plaintiff and the driver of the defendant's motor truck were fellow servants. If under the evidence in this case the plaintiff and the driver of the truck were mere fellow servants, then under the fellow-servant rule as recognized in our previous decisions, the defendant corporation would be free from any liability to the plaintiff for the injuries received as a proximate result of the negligence of the driver of the truck.

For many years the writer has seriously doubted the soundness and justice of the fellow-servant doctrine. Experience has shown that the application of this rule, more often than not, results in a gross injustice. Many reasons have been advanced by the courts to sustain this rule, some of which may have been quite reasonable as applied to the conditions existing when the rule was first adopted in this country, but facing conditions as they are today and have been for many years in the industrial world, it is indeed strange that we should go on holding that the master is liable to every one else in the world for the negligent acts of the employee whom he selects, while acting within the scope of his employment, except to the fellow servant or employee, who is usually more apt to be injured than any member of the general public, and who has usually, by the master's orders, been subjected to the peril of such negligence on the part of his fellow servant, in the selection of which fellow servant the injured servant had no voice whatever. Such a doctrine shocks our sense of justice. The general rule of *respondeat superior* should not any longer contain an exception which is so callous to human rights.

This doctrine of common employment or fellow servancy, as a defense, does not come down to us as a part of the English common law. Nor was it a part of the civil law. Prior to its adoption by the courts, the principle of *respondeat superior* appears to have been given full force and effect. The fellow-servant rule was first announced in England in 1837 in the Priestley case, and in this country by a decision of the Supreme Court of South Carolina, in 1841, in the case of Murray v. South Carolina Railroad Company, 1 McMul (S. C.) 385, 36 Am. Dec. 268, which was followed by the Supreme Court of Massachusetts the following year,

48

in Farwell v. Austin & Worcester Railway Corporation, 4 Metc. (Mass) 49, 38 Am. Dec. 339. As was said by this Court in Wilson & Toomer Fertilizer Co. v. Lee, 90 Fla. 632, 106 So. 482, 466: the case of "Priestley v. Fowler, 3 M. & W. 1, 19 E. R. C. 102, decided in England in 1837, is often cited as the first case declaring this rule, but this case did not directly involve the question of the liability of the master to a servant for the negligence of a fellow servant." Thus the rule began as a mere *obiter dictum*. That the doctrine had any existence prior to 1837 is conjectural, unsupported by any record or authorities, and it has been said that the contention that it had any existence prior to that time will not stand exposure to the spotlight of scholarly examination. La Batt, Vol. 4, Sev. 1394.

It thus appears that this is a court-made rule, hence not binding upon us as being a part of the common law adopted by the Territorial Legislature of Florida in 1829, and is therefore a rule which this Court has power to abrogate. In spite of our great respect for established precedent and the salutory doctrine of *stare decisis,* we think the time has come when this Court should announce that in future cases this Court will not consider itself bound to adhere to the fellow-servant rule. In all fairness such abrogation of the rule, if made now, should not affect this particular case. Generally speaking, changes in rules of law should not affect pending litigation. If the fellow-servant rule really applies in this case (and for reasons hereinafter mentioned, we do not think that it does), being supported as it is by a long line of precedents, set by this Court and practically all of the other courts of this country, any abrogation of the rule should be given a perspective, rather than a retroactive, effect. Especially is this true when dealing with a rule of substantive—not of procedural—law.

A complete history of the rule, its growth and development, and of the various reasons advanced by the courts in support of it, is reviewed in thorough-going fashion by La Batt, in the 4th volume of his monumental eight-volume treatise on the law of Master and Servant. Mr. LaBatt then proceeds to analyze and refute all of the reasoning thus advanced. He calls attention to the fact that the courts have relied mainly upon two theories: (1) "That the abrogation of the doctrine of common employment would have a decided tendency to render servants less cautious and efficient in the performance of their duties—a consequence prejudicial not only to the servants themselves, and their employers, but also, in no small degree, to that portion of the public which is directly affected by the manner in which the business in question is conducted.

(2) "That if servants were allowed to maintain actions for injuries caused by the negligence of their fellow servants, the investment of capital in industrial enterprises would be curtailed to such an extent as to inflict serious damage upon the community."

Without quoting any further, suffice it to say that Mr. La Batt makes adequate reply to these views, and remarks: "This situation is reduced * * * to something like an absurdity by the fact that the judicial theory as to the supposed inevitable consequences of allowing servants to recover for the negligence of their co-employees has long since been exploded by the logic of actual occurrences, the significance of which is unmistakable."

As we have seen, this doctrine was first announced in England in the Priestly case, back about one hundred years ago, and then in this country by the Supreme Court of South Carolina in the Murray case in' 1841, which was followed by the Fowler case in Masachusetts in 1842.

The other State courts, most of them, soon followed. Finally, practically all fell in line. In 1 Shearman & Redfield on Negligence, 426-427, it is said:

"Chief Justice SHAW's theory (in Farwell v. R. R., *supra*), that public policy requires that servants should have no remedy against their masters, in such cases, because the absence of any remedy will make them more careful of their own safety than they would otherwise be, is entirely untenable. We fully agree with Mr. Horace Smith and with the British Parliament, that true public policy is opposed to the whole rule of exemption to masters as against their servants, and that accidents would be far less frequent, and the public interests better served, if the rule were entirely abolished."

In the same work, at page 423, it is said:

"Since the whole of this new law consists of judicial legislation, the example of the British Parliament, composed almost in solid mass of wealthy employers, in repudiating judge-made law, invented solely for the benefit of that class, should have a powerful influence, in every court not yet tied up by precedents, in the direction of enlarging the responsibility of the employing class, rather than of diminishing it."

It thus appears that the fellow-servant rule was soon repudiated in England, where it was first announced.

As early as 1885, Judge FREEMAN, in his note at 67 Am. Dec. 589, called attention to the fact that:

"In the progress of society and general extension and diversification of business carried on by the same employer, it has been found that the rule often works injustice and hardship, and the tendency of the modern authorities appears to be in the direction of such a modification as shall eventually devolve upon the employer a just share of the

responsibility for the safety of his employees. While in many of the States the rule has become firmly ingrafted on their respective systems, still we find a constant tendency to make exceptions and lessen the harshness of the application of the rule to cases where manifest justness demands an abatement of its rigor." (In this connection see 18 R. C. L. 716-717.)

In their efforts to soften the harshness of the rule the courts have carved out so many exceptions to its applicability that many of them have come to be considered as a part of the original rule. For instance, the requirement of care in the selection of fellow servants; the non-delegable duty to furnish a safe place to work and safe tools to work with; the duty to instruct and to warn; the rule that holds the master liable where his negligence concurs with that of a fellow servant; the "vice-Principal" rule, and in some jurisdictions the "superior servant" rule; and in others the 'different department" rule.

The Legislatures have also taken a hand. Before the rule was fifty years old, and before it had ever been applied by the Supreme Court of Florida, the Legislature practically outlawed the rule as to railroad employees by Chapter 3744, Acts of 1887; and by Chapter 4071, Acts of 1891, Sections 7051-7053 C. G. L.; and by Chapter 6251, Acts of 1913, the employees not only of railroads, but of street car companies, light and power plants, telephone and telegraph companies, express companies, and workers upon power boats, were all exempted from the fellow servant rule, except where the injured employee and his fellow employee were both negligent and jointly engaged in the performance of the act causing the injury. See Sections 7058-7063 C. G. L.

In 1908 the fellow-servant rule was abolished as to all interstate carriers by the Federal Employers' Liability Act.

In some States, the doctrine has been abolished as to all corporation employees. Some States have statutes declaring all of those servants who exercise superintendence to be 'vice-principals." Others render the master liable for the negligence of any servant to whose orders the injured employee was bound to conform. Workers' Compensation Acts, beginning with the British Act of 1897, which give no recognition of the fellow-servant doctrine, are now in force in forty-seven American States including Florida. These Acts practically eliminate law suits in more than 90 per cent of all cases of injuries to employees. Thus this Court will not often be troubled in the future with the complex and worn-out ,fellow-servant doctrine. An illustration of the trend of judicial decisions will be shown in the opinion of the beloved Mr. Justice HOLMES, in the case of Uravic v. F. Jarka Company, 282 U. S. 234, 75 L. Ed. 312, 315. See also Buss v. Watchsmith (Wash.) 70 Pac. (2d) 417, 419.

Thus, ever since the Supreme Court of South Carolina, near the middle of the last century, originated this rule in America, the courts have been endeavoring to limit its application as far as possible so as to avoid the gross injustice which otherwise would have resulted. The writer of this opinion believes that this court could not abrogate in its entirety all that is left of the original rule, but it is not absolutely necessary to do so in this case. We think the problem here presented can be solved by an extension of the doctrine of "vice-principalship" which has received recognition by the authorities, that is, a qualification of the fellow-servant doctrine which exempts servants from application of that doctrine where they are injured by the negligence of persons to whom the master delegates the custody and control of a dangerous instrumentality, even

though that instrumentality be not dangerous *per se,* but only dangerous in its operation. This latter qualification may not have received any considerable degree of judicial recognition, but, as we shall endeavor to show, it is a logical outgrowth of our own former decisions. In other words, it is merely a new application of an old principle.

After reviewing the origin and growth of the fellow-servant doctrine and vigorously attacking its soundness, the position of defendant in error in this cause is stated by his counsel at page 44 of their brief as follows:

"But we did not seek in the court below, and we do not seek here, an adjudication abrogating the fellow-servant doctrine. Such asking is not necessary. There exists, we believe, already expressly recognized by the weight of authority a qualification of the fellow-servant doctrine which exempts servants from the application of that rule where they are injured by the negligence of the person to whom the master delegates the custody and control of a dangerous instrumentality. The court below recognized this qualification and recognized the decisions of this Court as bringing the plaintiff within the purview of that qualification."

The general rule applicable to dangerous agencies is that one who keeps in his possession, or employs in his business, that which unless carefully guarded and used, is dangerous to others, is bound to exercise proper care to see that it is so kept and used as not to inflict injury; and the negligence of any one into whose care it is committed by the owner, either in failing properly to guard it, or in improperly using it, is that of the owner.

As was said by La Batt, Master and Servant, Vol. 6, Sec. 2503:

"There is often much difficulty in determining what constitutes a dangerous agency; but when once its character

as such is established, a master may be held liable, not on the ground that he is master, but because he is a person employing the agency. To state that he cannot shift responsibility to his servants in respect to such agencies is merely to say the same thing in another way."

There has been some difference of opinion on the part of courts as to the degree of care which the owner of a dangerous instrumentality owes to others—whether consummate care, or the highest degree of care, or extraordinary care, or the care which is commensurate with the danger, but the undoubted weight of authority is that whatever degree of care the owner of such an agency is required to exercise, that duty is one which he cannot shift to the shoulders of an agent or employee in such sort as to relieve him of liability for injuries negligently caused to others, regardless of whether they be members of the general public or fellow servants of the employee to whom he has intrusted the care or use of the dangerous agency or instrumentality. The existence of this principle, and its undoubted application to the care and use of explosives, and also cases of damage done by vicious animals, is, we think, too well settled to require any citation of authorities. These agencies are dangerous *per se*. Thus explosives are inherently dangerous, even when they are stored for future use, and they are likewise dangerous when being used.

The question presented here is whether this principle of the owner's non-delegable liability as to dangerous instrumentalities should be confined to instruments which are dangerous *per se,* or can the same principle be reasonably and justly extended to instrumentalities which are not dangerous *per se,* but which are only dangerous when in operation. It is at once apparent that if this principle of the owner's non-delegable duty can properly be applied to

instrumentalities which are dangerous only when in operation, it would of course apply with full force and effect to motor vehicles.

There are undoubtedly some expressions in some of our opinions which would indicate that the Court had in mind that the fellow-servant rule constitutes a complete defense except where it has been abolished or modified by statute, such as the hazardous occupations Act and the railroad employee statutes which preceded it. See Engleman v. Traeger, 102 Fla. 756, 136 So. 527; Bryant v. Moss Packing Co., 118 Fla. 176, 158 So. 713; Ryan v. Noble, 95 Fla. 830, 116 So. 766. But we recall no case in which we have drawn a distinction between the master's duty with regard to the custody and use of an instrumentality dangerous *per se* and one merely dangerous in operation when the instrumentality was in fact in operation. The case of Southern Cotton Oil Co. v. Anderson, 80 Fla. 441, 86 So. 629, 16 A. L. R. 255, is strongly persuasive that no such distinction should be made. Indeed, in that case it was observed (80 Fla. 441), at page 638 of 86 So, 16 A. L. R. 255:

"In both decisions we applied the rule that the superior must respond in damages for the negligent acts of persons to whom he intrusts instrumentalities that are dangerous *per se* or dangerous in their use."

One of the determining factors as to whether a servant in a given case is a vice-principal of the master or a fellow servant is whether the duty which he is performing is a delegable or non-delegable one. Indeed, this seems to be *the* determining factor.

Undoubtedly, in many of the other States the courts have held that the operation of a motor vehicle is an ordinary delegable duty, and the fellow-servant doctrine is applicable as a defense. But in those States, unlike Florida, the

motor vehicle has not been held to be a dangerous instrumentality when in operation. The decisions from other States can be of little service to us here.

Florida was the first, and so far as the writer knows, the only State which, by judicial decision, has determined that an automobile in operation is a dangerous agency. That doctrine was first announced in Anderson v. Southern Cotton Oil Co., 73 Fla. 432, 74 So. 975. In the opinion in that case, Mr. Justice WHITFIELD, speaking for the Court, said:

"The principles of the common law do not permit the owner of an instrumentality that is not dangerous *per se* but is peculiarly dangerous in its operation, to authorize another to use such instrumentality on the public highways without imposing upon such owner liability for negligent use. The liability grows out of the obligation of the owner to have the vehicle * * * properly operated when it is by his authority on the public highway."

In 1920, this case reached this Court a second time. The doctrine as first announced was re-affirmed and supported by three able opinions. In the Court's opinion in that case, written by Mr. Chief Justice JEFFERSON B. BROWN, 80 Fla. 441, 86 So. 635, the Court, explaining its former language, said:

"In other words, that an automobile standing in a warehouse or garage is not a dangerous agency—that is, 'dangerous *per se*'—but when operated on the public highway it is dangerous agency."

The principal opinion concluded with these words:

"In intrusting the servant with this highly dangerous agency, the master put it in the servant's power to mismanage it, and as long as it was in his custody or control the master was liable for any injury which might be com-

mitted through his negligence." (Southern Cotton Oil Co. v. Anderson, 86 So., at page 636.)

And in Wolfe v. City of Miami, 103 Fla. 774, 134 So. 539, 540, this Court quoting from Herr v. Butler, 101 Fla. 1125, 132 So. 815, said:

"An automobile operated upon public highways being a dangerous machine, its owner is responsible for the manner in which it is used, and his liability extends to its use by any one with his knowledge or consent."

In Engleman v. Traeger, 102 Fla. 756, 136 So. 527, 529, it was said:

"The owner of an automobile * * * cannot make it possible for another to operate an automobile on the highways lawfully under his (the owner's) license, and then escape the responsibility for what the operator negligently does in operating the car, while the car is thus being operated under the owner's license and with the owner's permission, or with his knowledge and consent."

And in Boggs v. Butler, 129 Fla. 324, 176 So. 174, 176, we said:

"Under the law of this State, if the owner once gives his express or implied consent to another to operate his automobile, he is liable for the negligent operation of it no matter where the driver goes, stops or starts."

This Court was not unaware of the fact that its holding was at variance with that of other courts, which other courts evidently did not take into consideration the dangerous instrumentality doctrine as applied to motor vehicles. Indeed, Florida seems to stand pretty much alone on that doctrine. See 42 C. J. 1076, note at 16 A. L. R. 270; Huddy Cyc. of Automobile Law, Sec. 48149. In several States statutes have been enacted which make the owner liable to third persons for the negligent operation of an

automobile by any one using it with his knowledge and consent, but these statutes do not declare the automobile a dangerous instrumentality and do not attach to it all of those incidents which attach to dangerous instrumentalities.

It is not strange therefore that there are many cases from other jurisdictions holding that a fellow servant riding in an automobile cannot sue the master for injuries caused by the negligent use of the automobile by the person whom he has authorized or permitted to drive it. Such courts, rejecting the dangerous instrumentality doctrine, but holding to the fellow servant rule, could not well have decided otherwise. Therefore cases from other jurisdictions holding that a helper on a motor vehicle is a fellow servant of the driver are valueless in this jurisdiction. It is doubtful if any precedent could be obtained outside Florida as to the effect of the adjudication that an automobile is a dangerous instrumentality upon the applicability of the fellow-servant doctrine. And hitherto this Court has not spoken on that subject.

But more than twenty years have passed since this Court announced the dangerous instrumentality doctrine as applied to motor vehicles and as yet no serious attempt has been made by the Legislature to abolish that doctrine. None of the many amendments to the motor vehicle law of this State has impunged or questioned it. Indeed, it might be said that this doctrine received express legislative approval when the Legislature of 1937 granted exemption from the doctrine in the case of injuries to gratuitous guests or hitch hikers. See Chapter 18033, Acts of 1937.

Undoubtedly, time has proven the wisdom of the decision in the Anderson case. Compare the statistics referred to by the Court in that case with the startling increase in the number of deaths and injuries from automobile accidents

during the past decade. Since the opinion in the Anderson case was written, the number of deaths from automobile accidents has increased approximately 527 per cent. In the Anderson opinion there appears quoted with approval, a statement issued by the National Safety Council, which contains these words:

"We say that the automobile has become the most deadly machine in America."

And again:

"However cleverly the courts may state the reasons why they think the automobile in operation on streets and highways is not a dangerous instrumentality or agency, these statistics afford a complete refutation."

If the doctrine announced in the Anderson case was sound in 1920 it is certainly sound today. In the light of the facts, as known to every one, the motor vehicle is still a dangerous instrumentality when in operation on the streets and highways. The decision in the Anderson case is therefore adhered to.

In the light of our own former decisions, holding the motor vehicle to be a highly dangerous agency while in operation, it is but reasonable that we should attach thereto the law applicable to dangerous agencies, including the principle, applied to this particular case, that the driver of such dangerous agency, in this case a motor truck, is the vice-principal of his master, the owner, and that therefore in cases of this kind the fellow-servant doctrine cannot be invoked as a defense. In addition to the authorities above cited, see also Herr v. Butler, 101 Fla. 1125, 132 So. 815; Greene v. Miller, 102 Fla. 767, 136 So. 532; Holstun v. Embry, 124 Fla. 554, 169 So. 400, 406; A. C. L. R. Co. v. Beazley, 54 Fla. 311, 45 So. 761.

For the reasons above pointed out the judgments in both these cases are hereby affirmed.

Affirmed.

WHITFIELD, P. J., and CHAPMAN, J., concur.

BUFORD, J., concurs in opinion and judgment.

Justices TERRELL and THOMAS not participating as authorized by Section 4687, Compiled General Laws of 1927, and Rule 21-A of the Rules of this Court.

## ON PETITION FOR REHEARING

PER CURIAM.—A petition for rehearing having been filed in these causes, the whole Court has considered the petition and opinion. The majority of the Court do not concur in that portion of the opinion having reference to future application of the fellow-servant doctrine. In other respects the opinion is concurred in and the petition denied.

TERRELL, C. J., WHITFIELD, BUFORD, CHAPMAN and THOMAS, J. J., concur.

BROWN, J. (concurring). I concur in the denial of the petition for rehearing, but adhere to the original opinion as written.