### GRAIN DEALERS NAT. MUT. FIRE. INS. CO. v. HARRISON.
### No. 13249.

United States Court of Appeals,
Fifth Circuit.
June 30, 1951.

---

2. §§ 3770 (a) (1) and 3772 (a) (1), Title 26, U.S.C.A.

3. § 3760, Title 26, U.S.C.A.

William Y. Akerman, Orlando, Fla., for appellant.

Wilson Sanders, Orlando, Fla., for appellee.

Before HOLMES, McCORD and RUSSELL, Circuit Judges.

RUSSELL, Circuit Judge.

This appeal presents for review the legal validity of a verdict and judgment awarding the appellee $4,000.00 as damages for personal injuries sustained when an airplane owned by appellant, and being flown by its special agent, Rex Huffman, with appellee as passenger, did not land properly when the pilot so attempted in progress of a business trip on behalf of appellant. The complaint was based on the negligent operation of the airplane by the appellant's agent and employee. Negligence was denied by the appellant. The appellee was the plaintiff and the appellant the defendant and they will be hereinafter referred to as they appeared in the trial Court.

The flight from Orlando to Leesburg, Florida was uneventful until just before the actual landing at Leesburg. The approach to the field was made from the Southwest to the Northeast into the wind. An oak tree forty or fifty feet high stood approximately 360 feet from the edge of the paved portion of the runway. The pilot made the approach to the side of the tree and approximately the width of the runway, fifty feet, to the left of the paved portion. After the tree was cleared, some maneuver was made to the right to line up with the runway. What then occurred and was done is the material feature of the case. Beyond dispute, however, the plane settled very fast, touched, and bounced from, the runway approximately 15 feet in the air and the pilot, fortunately, was able, by opening the throttle, to continue

728

airborne and proceed to another airport, where an uneventful landing was made. The plaintiff contended that the contact with the runway and consequent bounce caused him personal injury. At the time in question, the weather was clear, the wind was East Northeast with a velocity of from 17 to 20 miles per hour, and gusty. The testimony in behalf of the plaintiff was to the effect that as the plane, a "Swift 125", passed the tree referred to, at a speed of approximately 70 miles per hour, and while the flaps were down, the pilot cut his power, side-slipped to the right, and "fell". He did not have power on "when he closed in". It was shown by qualified witnesses that for the type of plane in question the normal speed of approach should be above 75 miles per hour and this should be increased in proportion to gust velocity. The function of "flaps" was also explained and there was testimony that it was not approved practice to slip a ship of that type equipped with flaps.[1] It was testified that putting the plane into a slip at a distance of not more than 70 feet from the ground was not "the procedure which a reasonably prudent pilot would follow." It is contrary to government regulations which tell you definitely "you don't skid or slide ships with flaps", also, "you don't slide or slip on approach. When you come in thirty feet off the runway, if you have good sense, you go around again." The pilot acknowledged that he intentionally "skidded over" and contradicted the testimony of plaintiff's witnesses only by a statement that "I don't think we made an abnormal approach, other than the fact that we went to the left of the runway", and this was part of the "plan" on his part, done on account of the tree.

The defendant here assigns as error that there is no evidence of negligence on the part of the pilot and that the trial Court erred in permitting witnesses to give expert testimony in answer to hypothetical questions which assumed facts not support-

---

[1] "Q. Mr. Silver, what effect does the use of flaps have on a plane in landing? Particularly, on a Swift 125?

"A. Flaps on any type of aircraft could be considered as brakes. The purpose of a flap is two-fold. First, it changes the shape of the wing in such manner that you gain additional lift and reduced air speed. The second is that it acts like a kid going downhill on a scooter, dragging his feet. He can go down a steep hill without gaining speed. There's an advantage in flaps in that respect. When you once lower those, you are committed to keep on using them. If, for any reason, you allow that ship to slow down excessively, that is, to drop anywhere close to the critical speed, or below that amount, that ship will fall off on speed very, very rapidly, because of this additional drag, consequently the ship will go into a stall.

"Q. Does the use of flaps in a landing like that have any effect on the plane if the plane goes into a side-slip, or is put into a slide-slip?

"A. It is definitely not approved practice to slip or skid a ship of that type, equipped with flaps. The reason being that your flaps are an integral part of your wing. If we should slip or skid an aircraft with her flaps down, we have changed the direction of the air flow across that wing in such manner that we have blacked out and dispersed the air which those flaps control. Consequently, we have dropped the wing from that ship and caused it to stall. It's very dangerous, because if any engine is stalled, it will fall off in the direction of the rudder which has been applied. Consequently, if that ship is making an approach, and you have these flaps down and skid it or slip it or apply rudder, you have changed the direction of this air flow, consequently, you have increased your stalling speed. That it, without dropping the nose or without applying additional power, you will run every risk in the world of killing yourself. If that ship should stall—I am speaking of a slide—it has on the wing tips, slots. The purpose is to maintain an air flow over your ailerons, over the wing tips. The purpose is to give you control in case a ship approaches a stall, to keep your wings from falling too far and going into a spin. If that ship was not equipped with spoilers and you did go into a stall, you would spill it. The flaps would stall and the ship would go into an accelerated mushing attitude, sinking very rapidly, because just the wing tips are flying, and the ship would come in and land very hard."

This testimony was confirmed by another witness and indeed, was not contradicted.

ed by the evidence. It is further insisted that even though negligence may be established on the part of the pilot a recovery against the owner of the airplane is nevertheless not authorized unless the Court should hold that an airplane should, under the Florida law, be classed as such a dangerous instrument that its owner, by entrusting it to another to operate, is liable for the negligence of such operator. The applicability of the "fellow servant doctrine" in this case is likewise discussed, but, in the view we have of the matter, we do not reach this question.

■ The Supreme Court of Florida has declared the Florida law to be that the degree of care an aviator is required to exercise in the operation of his craft to be the law applicable to torts generally. " 'In the absence of statutes covering the operation and management of airplanes at the time and place of an accident, specifically applicable to the issue of negligence in the operation thereof, the rules of law applicable to torts—the ordinary rules of negligence and due care—obtain. Thus, the rule of the common law that every person shall use ordinary care not to injure another, that is, such care as the great mass of mankind would use under the same or similar circumstances or such care as the ordinarily prudent person would use under the same or similar circumstances, applies. An aviator is under no duty to use the highest degree of care that men of reasonable diligence or foresight ordinarily exercise in the operation of airplanes, but is bound only to use ordinary care, although here, as in any other case, ordinary care differs under the circumstances. The care must be commensurate with dangerous consequences to be reasonably apprehended; it may be a very high degree under some circumstances and of a slight degree under others.' " Peavey v. City of Miami, 146 Fla. 629, 1 So.2d 614, 618. The evidence, the substance of which we have recited above, was sufficient to authorize the jury to find that the conduct of the pilot, under the circumstances, did not meet the standard of ordinary care in that the pilot did not operate the plane with such care "as the ordinarily prudent person [pilot]

would use under the same or similar circumstances". The failure to use such care constituted negligence. The verdict of the jury was not without evidentiary support and the Court did not err in overruling the defendant's motion for an instructed verdict.

■ The evidence afforded a sufficient factual basis for the facts assumed in the hypothetical questions propounded, and the Court therefore did not err in permitting such questions to be answered. The only ground of objection upon the trial was that there was no evidence tending to prove the facts assumed in the hypothetical questions.

■ We do not have the benefit of any Florida decision classing an airplane in flight as a dangerous instrumentality from which the Florida law would impose liability upon an owner who permitted another to use it for such other's negligence without regard to any application of the doctrine of respondeat superior. However, this question, as relates to automobiles, is, and has been, well settled. The Florida decisions recognize that its holdings are at variance with those of other Courts. The Florida decisions do not classify the automobile as an instrumentality dangerous *per se,* but as one dangerous when in operation. As said in Wolfe v. City of Miami, 103 Fla. 774, 134 So. 539, 540, 137 So. 892, quoting from Herr v. Butler, 101 Fla. 1125, 132 So. 815, "An automobile operated upon the public highways being a dangerous machine, its owner is responsible for the manner in which it is used, and his liability extends to its use by any one with his knowledge or consent." This rule of liability is imposed whether it be a pedestrian who is injured, (Anderson v. Southern Cotton Oil Co., 73 Fla. 432, 74 So. 975, L.R.A.1917E, 715; Southern Cotton Oil Co. v. Anderson, 80 Fla. 441, 86 So. 629, 16 A.L.R. 255), or a passenger, (Crenshaw Brothers Produce Co. v. Harper, 142 Fla. 27, 194 So. 353). The latter case, 194 So. at page 364, refers to, and quotes from, numerous Florida decisions. Our examination of these authorities and the reasoning underlying their pronouncements leave no room for doubt that, under Florida law,

by which we are here governed, the airplane should be similarly classified with the automobile as "a dangerous agency when in operation." We can perceive no logical basis for any difference of classification which would authorize a holding that the rule of "dangerous agency" or "dangerous machine", which the Florida law applies to automobiles in operation, should be relaxed in the case of an airplane. This rule imposes liability upon the defendant for the acts and omissions of the pilot of its airplane which the jury was authorized to, and did, find constituted negligence.

The judgment of the trial Court is affirmed.