# Supreme Court of Florida

_____

No. SC17-67
_____

**ANTHONY NEWTON,**
Petitioner,

vs.

**CATERPILLAR FINANCIAL SERVICES CORPORATION, et al.,**
Respondents.

September 27, 2018

QUINCE, J.

Petitioner Anthony Newton seeks review of *Newton v. Caterpillar Financial Services Corp.*, 209 So. 3d 612 (Fla. 2d DCA 2016), on the ground that it expressly and directly conflicts with decisions of this Court and other district courts.[1] We have jurisdiction. *See* art. V, § 3(b)(3), Fla. Const. For the reasons that follow, we

---

1. The decision below conflicts with decisions of this Court and other district courts holding that different kinds of motorized equipment comparable to loaders are dangerous instrumentalities. *See*, *e.g.*, *Rippy v. Shepard*, 80 So. 3d 305 (Fla. 2012) (farm tractor); *Meister v. Fisher*, 462 So. 2d 1071 (Fla. 1984) (golf cart); *Sherrill v. Corbett Cranes Servs.*, 656 So. 2d 181 (Fla. 5th DCA 1995) (crane); *Lewis v. Sims Crane Serv. Inc.*, 498 So. 2d 573 (Fla. 3d DCA 1986) (construction hoist); *Eagle Stevedores, Inc. v. Thomas*, 145 So. 2d 551 (Fla. 3d DCA 1962) (tow-motor).

find that loaders are dangerous instrumentalities and quash the district court decision below.

## FACTS

C&J Bobcat and Hauling, LLC, hired Anthony Newton as an independent contractor to assist its agent, Charles Cram, in clearing debris from a private lot in a residential area. *Newton*, 209 So. 3d at 613. Cram and Newton used a multi-terrain loader to clear the lot. *Id.* Cram leased the loader from Caterpillar Financial Services Corporation (Caterpillar) and transported the loader to the private lot in a box trailer. *Id.* Cram disencumbered the box trailer and briefly drove the loader on the street before driving it onto the private lot. *Id.* Cram and Newton used the loader to dump debris into another box trailer for disposal. *Id.* The disposal trailer was parked on a public street.

While trying to move a tree stump into the disposal trailer, Cram asked Newton to climb inside and pack down the debris. *Id.* While Newton was inside, Cram released the stump from the loader's bucket into the disposal trailer. *Id.* Newton tried to warn Cram that he was still in the disposal trailer, but Cram could not hear him. *Id.* As Newton attempted to climb out of the disposal trailer, the stump rolled over his hand. *Id.* The stump severed Newton's middle finger. *Id.*

Newton filed suit against Caterpillar, alleging that Caterpillar was liable for the injuries he sustained from Cram's negligent operation of the loader because the

loader was a dangerous instrumentality. *Id.* at 613-14. Newton and Caterpillar filed competing motions for summary judgment disputing whether loaders are dangerous instrumentalities, each accompanied by affidavits from experts. *Id.* at 614. Newton's expert described the physical capabilities of loaders, including the ability to lift 2300 pounds to a height of approximately 9.5 feet. *Id.* at 614. Caterpillar's expert gave statistics about the loader, including the number of accidents involving the exact model of loader in this case which have been reported to Caterpillar. *Id.* at 615. The trial court heard arguments from both parties, found that loaders are not dangerous instrumentalities, and granted summary judgment in favor of Caterpillar. *Id.* at 615-16, 618.

## ANALYSIS

Whether loaders are dangerous instrumentalities is a pure question of law and is reviewed de novo. *See Rippy*, 80 So. 3d at 306 (citing *D'Angelo v. Fitzmaurice*, 863 So. 2d 311, 314 (Fla. 2003)). As we noted in *Rippy*, "Florida's dangerous instrumentality doctrine imposes 'vicarious liability upon the owner of a motor vehicle who voluntarily entrusts that motor vehicle to an individual whose negligent operation causes damage to another.' " *Rippy*, 80 So. 3d at 306 (quoting *Aurbach v. Gallina*, 753 So. 2d 60, 62 (Fla. 2000)). The "doctrine is an old and well-settled rule that can be traced back to English common law . . . [and applies] to objects that 'common knowledge and common experience prove[] to be . . .

potent sources of danger.' " *Id.* at 306-07 (quoting *S. Cotton Oil Co. v. Anderson*, 86 So. 629, 631 (Fla. 1920)).

Florida courts consider a variety of factors in applying the dangerous instrumentality doctrine. *Id.* at 308. One of the most important factors is whether the instrumentality is a motor vehicle. *Id.* Courts also consider whether the instrumentality is frequently operated near the public, but the incident under review need not have occurred on public property for the instrumentality to be dangerous. *Id.* at 308-09. Another factor is the instrumentality's peculiar dangers relative to other objects that courts have found to be dangerous instrumentalities. *See Meister*, 462 So. 2d at 1073. Courts also consider how extensively the legislature has regulated the instrumentality. *See id.* at 1072-73. Evaluations of each factor may be based on "common knowledge and common experience" and should not be at odds with "the common opinion among many." *S. Cotton Oil Co.*, 86 So. at 631, 633. No single factor "is determinative of whether an instrumentality is dangerous." *Rippy*, 80 So. 3d at 308. It "is based on 'the practical fact that the owner of an instrumentality which [has] the capability of causing death or destruction should in justice answer for misuse of this instrumentality by anyone operating it with his knowledge and consent.' " *Id.* at 307 (quoting *Meister*, 462 So. 2d at 1072).

- 4 -

First, we examine whether loaders are motor vehicles. Because " the 'various definitions of "motor vehicle" within the Florida Statutes are not dispositive,' " *Newton*, 209 So. 3d at 616 (quoting *Harding v. Allen-Laux, Inc.*, 559 So. 2d 107, 108 (Fla. 2d DCA 1990)), we consult *Black's Law Dictionary*. A "motor vehicle" is: "A wheeled conveyance that does not run on rails and is self-propelled, esp. one powered by an internal-combustion engine, a battery or fuel-cell, or a combination of these." *Blacks Law Dictionary* 1788 (10th ed. 2014). Loaders are self-propelled, powered by an engine, and can be wheeled conveyances. Common knowledge and plain language demonstrate that loaders, like farm tractors and forklifts, are motor vehicles for the purpose of the dangerous instrumentality doctrine.

Much like the farm tractors considered in *Rippy*, loaders are often operated in construction settings and on public rights-of-way and are "vehicles of such size and speed that wherever they are operated, they can be dangerous to those persons who come into contact with them." *Rippy*, 80 So. 3d at 309. The undisputed facts of this case confirm that loaders are frequently used to clear private lots near public streets. This Court is persuaded that, while multi-terrain loaders may operate in public less often than their counterparts, loaders operate near the public frequently. Further, as we noted in *Rippy*, "the dangerous instrumentality doctrine is not limited to motor vehicles being operated on a public highway and may apply to a

motor vehicle operated on private property." *Rippy*, 8 So. 3d at 307 (citing *Meister*, 462 So. 2d at 1073).

Loaders are heavy pieces of construction equipment weighing thousands of pounds. Loaders can move heavy loads across streets and unimproved surfaces. Multi-terrain loaders have tank-style treads designed for use on unimproved surfaces, while skid steer loaders have large tires designed for improved surfaces. Some loaders, like the one in this case, can be converted from treads to tires. Attached to their front ends, loaders have buckets in which heavy items can be lifted above the height of the average person. The bucket can obstruct operator visibility because loaders are operated from within cages in their centers.

The loader in this case weighed 8000 pounds and had treads at the time of the accident, though it could be modified to operate on tires. *Newton*, 209 So. 3d at 614-16 & n.2. Newton's expert averred that the loader could lift 2300 pounds to a height of 9.5 feet and that its design restricted the operator's visibility. *Id.* at 615. His affidavit also indicated "that the loader's potential momentum placed it within a range of momentums associated with other dangerous instrumentalities." *Id.* Common knowledge demonstrates that a machine as powerful as a loader has the ability to cause serious injury when operated near or over a public street, just like any motor vehicle operated on a public highway. As the Second District noted

- 6 -

below, "the loader is a serious piece of machinery with the capacity to do great harm." *Newton*, 209 So. 3d at 618.

Finally, we hold that Newton's status as an independent contractor does not exclude him from protection under the dangerous instrumentality doctrine. The doctrine has not treated construction workers as separate from the general public when injured in a public place. *See N. Trust Bank of Fla., N.A. v. Constr. Equip. Int'l*, 587 So. 2d 502, 504 (Fla. 3d DCA 1991); *cf. Canull v. Hodges*, 584 So. 2d 1095, 1097 (Fla. 1st DCA 1991). Newton may not have been "a member of the unsuspecting public," *Newton* 209 S0. 3d at 616, but his accident occurred on a public street. Newton's employment does not disqualify his accident from coverage under the doctrine.

## CONCLUSION

Based on the foregoing, we determine that a loader is a dangerous instrumentality as a matter of law. Accordingly, we quash the decision below and remand to the district court with instructions that this case be further remanded to the trial court for an order granting summary judgment in favor of Newton.

It is so ordered.

PARIENTE, LEWIS, and LABARGA, JJ., concur.
LAWSON, J., dissents with an opinion, in which CANADY, C.J., and POLSTON, J., concur.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.

LAWSON, J., dissenting.

I respectfully dissent because this Court does not have jurisdiction to decide this case. To confer jurisdiction on this Court on the basis of a conflict, a decision of a district court must "expressly and directly conflict[] with a decision of another district court of appeal or of [this Court] on the same question of law." Art. V, § 3(b)(3), Fla. Const. To meet this standard, the cases alleged to be in conflict must not be distinguishable from one another, *cf. Fla. Dep't of Children & Families v. Davis Family Day Care Home*, 160 So. 3d 854, 855 n.1 (Fla. 2015) (opining that the district court's certification of conflict was misguided because the two cases were distinguishable), and they must decide—meaning reach a holding on—the same question of law, *see Ciongoli v. State*, 337 So. 2d 780, 781 (Fla. 1976) (discharging jurisdiction where "the conflicting language [was] mere *obiter dicta*"). Also, the conflict must "appear within the four corners of" the district court's decision. *Reaves v. State*, 485 So. 2d 829, 830 (Fla. 1986).

The majority has accepted this case on the basis of alleged conflict between *Newton v. Caterpillar Financial Services Corp.*, 209 So. 3d 612 (Fla. 2d DCA 2016), which holds that a loader is not a dangerous instrumentality, and the following set of decisions recognizing diverse pieces of machinery as dangerous instrumentalities: *Rippy v. Shepard*, 80 So. 3d 305 (Fla. 2012) (farm tractor); *Meister v. Fisher*, 462 So. 2d 1071 (Fla. 1984) (golf cart); *Sherrill v. Corbett*

- 8 -

*Cranes Services*, 656 So. 2d 181 (Fla. 5th DCA 1995) (crane); *Lewis v. Sims Crane Service Inc.*, 498 So. 2d 573 (Fla. 3d DCA 1986) (construction hoist); *Eagle Stevedores, Inc. v. Thomas*, 145 So. 2d 551 (Fla. 3d DCA 1962) (tow-motor). There is no express and direct conflict between *Newton* and any of these decisions.

It appears that the majority has found jurisdiction by noting the devices deemed dangerous instrumentalities in the five listed cases, considering the loader at issue in this case, and concluding instinctively that if these other five devices are dangerous instrumentalities, a loader surely is as well. *See* majority op. at 1 note1 (explaining jurisdiction by reference to a list of items held to be dangerous instrumentalities in other cases). Problems with this approach include that each case addresses a different device with its own distinct characteristics, some of which are simply incomparable to the characteristics of the construction equipment at issue in this case, and that not all the cases even describe the characteristics of the devices being addressed. *Compare Rippy*, 80 So. 3d at 309 (noting that a farm tractor is "often seen on public highways and rights-of-way") *with Newton*, 209 So. 3d at 614-15 (citing evidence that the loader "was not routinely operated on public highways, rights-of-way, golf courses, or other improved surfaces" or designed for that purpose); *see Meister*, 462 So. 2d at 1072-73 (analyzing golf carts based on commonly known characteristics and uses); *Sherrill*, 656 So. 2d at 183-84 (implicitly accepting the proposition that a crane is a dangerous instrumentality

without mentioning any of its characteristics); *Lewis*, 498 So. 2d at 575 (supporting a conclusion that a construction hoist is a dangerous instrumentality by citation to other decisions, not analysis of its characteristics); *Thomas*, 145 So. 2d at 551-52 (describing a "tow motor" only as "a small motor operated vehicle" and addressing narrow arguments concerning the location of the tow motor and whether a required license had been obtained). A related problem is that this approach was expressly foreclosed by disclaimers this Court made in *Rippy*. 80 So. 3d at 308-09 (explaining that the Court's prior conclusion that a golf cart is a dangerous instrumentality is not "the one touchstone by which all other instrumentalities are measured" and that the Court's decision was not based on a simple comparison of devices). And, as to one case, *Sherrill*, the assertion that the device involved is a dangerous instrumentality is not a question of law decided in the case at all. *See generally Sherrill*, 656 So. 2d at 182-86 (analyzing whether the trial court erred in determining that a "crane operator was, a matter of law, a borrowed servant" of a general contractor under workers' compensation law).

To further explain these points, I will first discuss the contradiction between this Court's opinion in *Rippy* and the general approach to finding conflict that the majority has taken in this case, and then I will address each of the five cases specifically to show that there is no express and direct conflict, as required for this Court to exercise jurisdiction in this case.

In *Rippy*, this Court explained that a device fits within the dangerous instrumentality doctrine when it is an " 'instrumentality of known qualities [that] is so peculiarly dangerous in its operation' as to justify" making the owner of the device liable for damage caused when it is operated negligently by someone the owner has entrusted with the device.  80 So. 3d at 306 (alteration in original) (quoting *S. Cotton Oil Co. v. Anderson*, 86 So. 2d 629, 638 (Fla. 1920)).  This Court went on to determine whether a farm tractor should be considered a dangerous instrumentality by considering various factors gleaned from prior decisions, without identifying any concrete list of factors as mandatory considerations or requiring that any particular weight be given to specific factors, other than to say that whether the device is a "motor vehicle" is "[a] primary factor."  *Id*. at 308-09.

In setting forth this loose, factor-based approach, the *Rippy* Court made a special point to say that "no one test is determinative of whether an instrumentality is dangerous."  80 So. 3d at 308.  More significantly in light of the implied reasoning the majority offers in support of exercising jurisdiction in this case, the *Rippy* opinion pointedly states the following: "[T]he contention . . . that this Court's ruling in *Meister*—that a golf cart is a dangerous instrumentality—'sets the bar' low, and the resulting implication that this has become the one touchstone by which all other instrumentalities are measured, is incorrect."  *Id*. (citation omitted).

- 11 -

The *Rippy* Court drove this point home by denying that its decision was based "simply on 'a comparison between the device at issue [a farm tractor] and a golf cart.' " *Id.* at 309. If, as this Court said in *Rippy*, there is no one test that is determinative and comparison of devices does not suffice to answer whether a particular device is a dangerous instrumentality, then a list of devices addressed in prior decisions does not show express and direct conflict between those prior decisions and a decision addressing the specific, distinct device at issue in this case.

Thus, in light of this Court's analysis and express disclaimers in *Rippy*, I disagree with the general suggestion in the majority opinion that express-and-direct-conflict jurisdiction is established by the bare fact that each of the listed devices, none of which is a loader, has been determined by either this Court or another district court of appeal to be a dangerous instrumentality. Below, I more closely examine the five cases cited as grounds for this Court to exercise jurisdiction to show that the decisions themselves do not contain any other basis for finding express and direct conflict.

The first two cases, *Rippy* and *Meister*, set out the very broad rule, already noted above, that a device is a dangerous instrumentality if its characteristics and uses justify holding its owner liable for damages caused by another person to whom the device has been entrusted. *Rippy*, 80 So. 3d at 306; *Meister*, 462 So. 2d

at 1072 (quoting *Jordan v. Kelson*, 299 So. 2d 109, 111 (Fla. 4th DCA 1974)).

Both *Rippy* and *Meister* then examine factors to decide if the particular devices at issue, a farm tractor and a golf cart, meet this standard. *Rippy*, 80 So. 3d at 308-09; *Meister*, 462 So. 2d at 1072-73. The factors this Court determined relevant in its analysis of the farm tractor and golf cart consisted of the following: (1) whether the device is a motor vehicle, *Rippy*, 80 So. 3d at 308; *Meister*, 462 So. 2d at 1072; (2) the extent to which the device is legislatively regulated, *Rippy*, 80 So. 3d at 308; *Meister*, 462 So. 2d at 1072; (3) the likelihood that members of the public will come into contact with the device in operation, *Rippy*, 80 So. 3d at 308-09, *Meister*, 462 So. 2d at 1073; and (4) how similar the accidents and injuries associated with the device are to the accidents and injuries caused by automobiles,[2] *Rippy*, 80 So. 3d at 309; *Meister*, 462 So. 2d at 1073. In addition, in *Rippy*, this Court considered the physical characteristics of farm tractors. 80 So. 3d at 309 (considering size, speed, weight, and mechanism).

In the decision on review, the *Newton* court recognized the factor approach exemplified in *Rippy* and *Meister*. *Newton*, 209 So. 3d at 615. At the outset of its

---

2. The first application of the dangerous instrumentality doctrine by this Court was to automobiles being operated on public highways. *Rippy*, 80 So. 3d at 307 (quoting *S. Cotton Oil Co. v. Anderson*, 86 So. 629, 638 (Fla. 1920)).

discussion, the *Newton* court identified the factors it had determined relevant from a thorough study of this Court's precedent as well as district court precedent:

> Whether the loader in this case is a dangerous instrumentality presents a pure question of law that this court reviews de novo. *See Rippy v. Shepard*, 80 So. 3d 305, 306 (Fla. 2012). The doctrine imposes vicarious liability on the owner of an " 'instrumentality of known qualities [that] is so peculiarly dangerous in its operation' as to justify application" of the doctrine. *Id.* (quoting *S. Cotton Oil Co. v. Anderson*, 80 Fla. 441, 86 So. 629, 638 (Fla. 1920) (on petition for rehearing)). In deciding whether something is a dangerous instrumentality, courts consider a number of factors. "A primary factor in determining whether an object is a dangerous instrumentality is whether the object at issue is a motor vehicle." *Id.* at 308. Courts also evaluate the extent to which an object is regulated because legislative regulation is a recognition of the danger posed by the use of the evaluated instrumentality. *See S. Cotton Oil Co.*, 86 So. at 634 ("It is idle to say that the Legislature imposed all these restraints, regulations, and restrictions upon the use of automobiles, if they were not dangerous agencies which the Legislature felt it was its duty to regulate and restrain for the protection of the public."). Another factor is the relative danger posed by the instrumentality. *See id.* at 633; *Festival Fun Parks, LLC v. Gooch*, 904 So. 2d 542, 546 (Fla. 4th DCA 2005) (noting that accidents involving go-karts causing serious injury were "pretty rare"). The physical characteristics of the object are also pertinent to the dangerous instrumentality inquiry. *See Rippy*, 80 So. 3d at 309; *Harding v. Allen-Laux, Inc.*, 559 So. 2d 107, 108 (Fla. 2d DCA 1990) (describing a forklift as a "large[ ], four-wheel vehicle with protruding steel tusks"). Courts also consider whether the instrumentality at issue is operated in close proximity to the public. *Compare Harding*, 559 So. 2d at 108 (considering forklift involved in accident with a motor vehicle on public highway), *with Canull v. Hodges*, 584 So. 2d 1095, 1097 (Fla. 1st DCA 1991) ("The road grader we are asked to classify as a dangerous instrumentality was not licensed or regulated and *was operating on an airport construction site and its operator was apparently a fellow employee of the plaintiff*." (emphasis added)).

*Id.* at 614. The *Newton* court then concluded, correctly, that "[n]o single factor is determinative of the inquiry, and this list of factors is not exhaustive," but "[r]ather, these factors exist to assist courts in determining whether an application of the dangerous instrumentality doctrine is justified." *Id.* The *Newton* court applied each of the factors it identified, with an analysis specific to the loader at issue in this case. *Id.* at 615-18. Because the *Newton* court applied a list of factors consistent with the factors this Court relied on in *Rippy* and *Meister* and was considering a different device from those analyzed in *Rippy* and *Meister*, there is no express and direct conflict with either *Rippy* or *Meister*.[3]

---

3. In his jurisdictional brief, Newton argued conflict with *Rippy* and *Meister* because, among other reasons, the *Newton* court considered it significant that this particular loader was being operated on a private lot at the time of the injury and that Newton, the injured party, was not a "member of the unsuspecting public," *Newton*, 209 So. 3d at 616, while this Court in *Rippy* and *Meister* held that operation on public highways is not a requirement of the dangerous instrumentality doctrine, *Rippy*, 80 So. 3d at 309; *Meister*, 462 So. 2d at 1073. However, it is clear that the *Newton* court did not find the loader's operation on private property at the time of the accident dispositive. The court stated that "[n]o single factor is determinative of the inquiry" and, besides considering where the loader was being used at the time of the accident, pointed out that there "was no evidence that these loaders were routinely operated in close proximity to the public." 209 So. 3d at 614, 617. *Meister* and *Rippy* make clear that it is relevant whether a particular device tends to be operated in close proximity to the public, and in fact, *Meister*'s holding is limited to golf carts that are being operated on golf courses. *Meister*, 462 So. 2d at 1071, 1073 (holding that "a golf cart that is being operated on a golf course is included within the dangerous instrumentality doctrine" and concluding that golf carts pose "sufficient danger to the public" to justify applying the doctrine because golf carts and courses are "extremely prevalent" in this state, golf carts cause similar accidents and injuries to other motor vehicles, and the Legislature has found it necessary to regulate them); *Rippy*, 80 So. 3d at 309 (noting that farm

After citing *Rippy* and *Meister* as decisions in conflict with *Newton*, the majority cites three district court cases: *Lewis*, *Sherrill*, and *Thomas*.

As for *Lewis*, the determination of conflict could not have been based on anything but a conclusory comparison of devices. The *Lewis* court's conclusion that the device at issue, a "construction hoist, or elevator," 498 So. 2d at 574, is a dangerous instrumentality is supported by one sentence of explanation: "It has been held that construction hoists are inherently dangerous instrumentalities," *id.* at 575. The *Lewis* court's bare conclusion that a construction hoist is a dangerous instrumentality does not conflict with the *Newton* court's conclusion that the loader used in this case is not. Not only does an intuitive comparison of the two devices lead to this conclusion of lack of conflict, but the guidance this Court set out in *Rippy* indicates that more than an intuitive comparison is required. *See Rippy*, 80 So. 3d at 308-09. Because the *Lewis* decision offers nothing more than a conclusion that construction hoists qualify as dangerous instrumentalities, it

_____

tractors are most often, but not always, operated on farm property and that they "frequently operate along state roads and other public areas")). The *Newton* court's exercise of taking into account, as one subfactor among many, that the device at issue—which, unlike farm tractors and golf carts, was not shown to be of the type that frequently operates in public spaces—was being operated on a private lot at the time of the accident, does not expressly and directly conflict with *Rippy*, *Meister*, or any other decision that has been cited to us.

provides no basis upon which we could conclude that there is an express and direct conflict of decisions and remain consistent with the *Rippy* analysis.

The conclusion that the *Sherrill* decision expressly and directly conflicts with *Newton* suffers the same failing and more. It appears that the majority has decided that a bare assertion in *Sherrill* that a crane is a dangerous instrumentality conflicts with the *Newton* court's factor-based conclusion that a loader is not a dangerous instrumentality. *See* majority op. at 1 note 1. Not only is this analysis invalid because *Rippy* establishes that a simple comparison is an illegitimate basis for a decision on the merits—and, *a fortiori*, for a finding of conflict—, 80 So. 3d at 308-09, but it is invalid because the *Sherrill* court did not even conclude that a crane is a dangerous instrumentality. *See generally Sherrill*, 656 So. 2d at 182-86. Whether a crane is a dangerous instrumentality was not a question of law presented to the *Sherrill* court to decide. *See generally id*.

The sole issue decided by the *Sherrill* court was whether the trial court erred in determining that a "crane operator was, as a matter of law, a borrowed servant" of a general contractor under workers' compensation law. 656 So. 2d at 182-83. The general contractor had leased the crane, and the lease for the crane required the lessor to "[f]urnish" an operator as well. *Id*. at 182. The crane operator was involved in an accident with the crane that injured an employee of the general contractor. *Id*. The employee obtained workers' compensation benefits from the

- 17 -

general contractor and sued both the owner of the crane and the employer of the crane operator for negligence. *Id.* The *Sherrill* court explained that if the crane operator was properly considered a "borrowed servant" (an issue improperly decided on summary judgment by the trial court), the crane operator's employer and the crane's owner would be entitled to workers' compensation immunity. 656 So. 2d at 182-83.

The impression that the *Sherrill* court concluded that a crane is a dangerous instrumentality seems to arise from this language:

> [H]ad [the crane owner] simply leased the crane to [the general contractor], it would clearly be immune from liability under the worker's compensation statutes since its purported liability under these circumstances would be based solely on the 'dangerous instrumentality' doctrine. Florida has long recognized that a worker injured by a *leased* dangerous instrumentality operated by a *fellow* worker is limited to no more recovery than that permitted by the worker's compensation statutes.

656 So. 2d at 183. The *Sherrill* court then explained that the facts of the case indicated that the company that owned the crane "may have become either a subcontractor or an independent contractor," which would negate the applicability of workers' compensation immunity, but that the crane owner argued that the "borrowed servant" doctrine applied, making the general contractor liable for the crane operator's activities and causing the general contractor's workers' compensation insurance to extend to any liability for the injury the crane operator caused. *Id.* at 183-84. The *Sherrill* court quoted from two cases explaining that "a

worker injured by a leased dangerous instrumentality operated by a fellow worker is limited to no more recovery than that permitted by the worker's compensation statutes." *Id*. at 183 (quoting *Halifax Paving, Inc. v. Scott & Jobalia Construction Co.,* 565 So. 2d 1346, 1347 (Fla. 1990)); *see also id*. at 184 ("When a dangerous instrumentality is leased to an employer, the lessor shares the employer's worker's compensation immunity from suit by employees." (quoting *Larzelere v. Employers Ins. of Wausau*, 613 So. 2d 510, 511 (Fla. 2d DCA 1993)). Essentially, the *Sherrill* court explained that, even though the crane was a dangerous instrumentality—which was apparently not in dispute and, therefore, not a question of law decided by that court—the injured party's recovery was limited by the workers' compensation statutes if the crane operator ultimately was proven as a matter of fact to be a "borrowed servant." *See id*. at 183-84, 186. The crane's status as a dangerous instrumentality was a conceded point acknowledged in passing and not a decision of the court on a question of law. Therefore, it does not support a finding of express and direct conflict.

Finally, *Thomas* does not expressly and directly conflict with *Newton*. The *Thomas* decision's entire discussion of the dangerous instrumentality issue consists of the following:

> Appellee, plaintiff below, while standing near a lunch truck in a street end or extension located in a harbor dock area, was struck and injured by a small motor operated vehicle referred to as a 'tow-motor.' The vehicle was owned by the corporate defendant and operated by

the individual defendant with the former's knowledge and consent. . . . On appeal, it is contended that the dangerous instrumentality doctrine as referable to motor vehicles was not applicable because the vehicle involved was not licensed and because the accident did not occur on a publicly maintained street or thoroughfare. . . .

On the evidence, the jury was entitled to find that the injury occurred on a public street or highway maintained by the city for vehicular and pedestrian traffic, and that the 'tow-motor' was a motor vehicle. On those facts the dangerous instrumentality doctrine properly applied. An owner or driver may not escape liability for negligent operation of a motor vehicle on a public street or highway because the required licensing of the vehicle has been omitted.

145 So. 2d at 551-52 (footnotes omitted). *Thomas* contains no discussion of the factors identified in *Newton*, except for the operation of the vehicle in proximity to the public, but it also does not rule out consideration of these factors. *See id.* The *Thomas* court addressed and rejected a specific, narrow argument that the tow motor was not being operated in public and, therefore, could not qualify as a dangerous instrumentality. *Id.* The *Thomas* court resolved the issue by concluding that the tow motor was, in fact, being operated in public. *Id.* Given this conclusion, the *Thomas* court did not need to answer any larger question concerning whether operation in public is necessary or relevant to a finding that a particular device is a dangerous instrumentality.

The *Newton* decision involves a much more complicated question: whether, based on facts concerning the loader and its operation and a variety of factors developed in case law generated after *Thomas*, the loader meets the general test for

being considered a dangerous instrumentality.  *See Newton*, 209 So. 3d at 614-18.

Unlike the situation in *Thomas*, the location of the device at the time of the injury

is a single point in a multi-faceted analysis arising from a full argument concerning

the legal requirements for qualifying a device as a dangerous instrumentality.  *See*

*Newton*, 209 So. 3d at 614-18.  The *Newton* court considered the location of the

loader relevant, but not dispositive.  *See id.* at 614 ("No single factor is

determinative of the inquiry . . . .").  Its comprehensive, factor-based analysis of

the broad question presented does not expressly and directly conflict with the

*Thomas* court's tacit acceptance of the proposition that a device being operated in

private is not a dangerous instrumentality and its narrow conclusion that the

particular device at issue, a tow motor, was not removed from the dangerous

instrumentality doctrine due to the nature of the street on which it was being

operated.

Further, unlike *Thomas*, the *Newton* opinion indicates that there was no

dispute that the device in question was being operated on a private lot at the time

of the injury.  *See Newton*, 209 So. 3d at 613.[4]  Therefore, the narrow issue

_____

4. The majority notes that Newton's "accident occurred on a public street"
because that is where the disposal trailer was parked.  Majority op. at 2, 7.  This
observation is a conclusion derived from the record, rather than the *Newton*
opinion.  Therefore, it does not affect the jurisdictional analysis.  *See Reaves*, 485
So. 2d at 830 & n.3.

- 21 -

addressed in *Thomas*—whether evidence presented at trial supported a finding that the device was being operated in public—was not at issue in *Newton*.

For the foregoing reasons, none of the decisions the majority relies on as the grounds for jurisdiction over this case satisfy the constitutional requirements for the cited jurisdictional basis, express and direct conflict on the same question of law. *See* art. V, § 3(b)(3).  Therefore, I dissent.

CANADY, C.J., and POLSTON, J., concur.

Application for Review of the Decision of the District Court of Appeal – Direct Conflict of Decisions

    Second District - Case No. 2D15-2927

    (Pinellas County)

T. Patton Youngblood, Jr. of Youngblood Law Firm, St. Petersburg, Florida; and Steven L. Brannock and Thomas J. Seider of Brannock & Humphries, Tampa, Florida,

    for Petitioner

Hala Sandridge and Blake J. Delaney of Buchanan Ingersoll & Rooney, PC, Tampa, Florida,

    for Respondent Caterpillar Financial Services Corporation